[No. B190637. Second Dist., Div. Seven. Feb. 5, 2007.]

In re HUDIE JOYCE WALKER on Habeas Corpus.

534

COUNSEL

Latham & Watkins, Beth Collins-Burgard and Daniel Seltzer for Petitioner Hudie Joyce Walker.

Bill Lockyer, Attorney General, Robert R. Anderson and Mary Jo Graves, Chief Assistant Attorneys General, Pamela C. Hamanaka, Assistant Attorney General, Robert F. Katz and Robert C. Schneider, Deputy Attorneys General, for Respondent the People.

OPINION

**PERLUSS, P. J.**—Fourteen years ago this court rejected Hudie Joyce Walker's contention the failure of her trial counsel to introduce expert testimony on intimate partner battering and its effects[1] constituted ineffective

---

[1] Although often referred to as "battered women's syndrome," "intimate partner battering and its effects" is the more accurate and now preferred term. (See, e.g., Stats. 2004, ch. 609, §§ 1, 2 [changing references in Evid. Code, § 1107 and Pen. Code, § 1473.5 from "battered women's syndrome" to "intimate partner battering and its effects"]; see also *People v. Humphrey* (1996) 13 Cal.4th 1073, 1083–1084, fn. 3 [56 Cal.Rptr.2d 142, 921 P.2d 1] [recognizing, according to amici curiae, " 'the preferred term among many experts today is

assistance of counsel, explaining that her lawyer had made a "rational and informed decision on trial strategy" because the evidence would have undermined Walker's claim she accidentally shot and killed her abusive husband Thomas Walker while struggling with him for a gun and, in any event, would not have supported a self-defense or imperfect self-defense theory because Walker insisted the homicide was an accident. (*People v. Walker* (Nov. 10, 1992, B058840) [nonpub. opn.] (*Walker I*).) Accordingly, we held Walker, who was serving a state prison term of 19 years to life for second degree murder, had not demonstrated her trial counsel's performance was constitutionally deficient or, assuming Walker had in fact been subjected to intimate partner battering, there was a reasonable probability introduction of expert testimony on that subject would have resulted in a more favorable outcome at trial.

Three years after our decision in *Walker I*, in *People v. Barton* (1995) 12 Cal.4th 186 [47 Cal.Rptr.2d 569, 906 P.2d 531] (*Barton*), the Supreme Court disapproved its earlier decision in *People v. Wickersham* (1982) 32 Cal.3d 307, 329 [185 Cal.Rptr. 436, 650 P.2d 311], and held imperfect or unreasonable self-defense "is not a defense but a crime; more precisely, it is a lesser offense included in the crime of murder." (*Barton*, at pp. 200–201.) However inconsistent the defendant's version of the crime and whatever the arguments of the prosecutor and defense counsel, after *Barton* to obtain a guilty verdict on a charge of murder, the trial court must instruct the jury the People have the burden of proving beyond a reasonable doubt the defendant was not acting in imperfect self-defense whenever the record contains substantial evidence from which the jury could reasonably conclude the defendant was guilty only of voluntary manslaughter. (See *Barton*, at pp. 201–202 [although defendant claimed gun discharged accidentally, jury could reasonably discount this self-serving testimony in light of other evidence concerning defendant's conduct and conclude killing occurred either in unreasonable but good faith belief that defendant had to defend himself or as an intentional act satisfying the elements of murder].) The following year in *People v. Humphrey, supra,* 13 Cal.4th at pages 1086–1087 (*Humphrey*), the Supreme Court held expert testimony concerning intimate partner battering and its effects, expressly made admissible in criminal actions by Evidence Code section 1107 as of January 1, 1992, was relevant in a murder case to the determination of both the subjective existence and objective reasonableness of a defendant's belief in the need to defend herself or himself.

---

"expert testimony on battering and its effects" or "expert testimony on battered women's experiences" ' "]; *In re Nourn* (2006) 145 Cal.App.4th 820, 825, fn. 1 [52 Cal.Rptr.3d 31] [the term "battered women's syndrome" is misleading because it appears incorrectly to limit that syndrome to women].)

In her petition for a writ of habeas corpus pursuant to Penal Code section 1473.5 (section 1473.5), enacted by the Legislature in 2001 for the benefit of individuals like Walker who were convicted of murdering their abusive partners prior to the effective date of Evidence Code section 1107 and the Supreme Court's decision in *Humphrey, supra,* 13 Cal.4th 1073, Walker asks us to reconsider our decision in *Walker I* and to find the failure of her trial counsel to introduce expert testimony regarding intimate partner battering and its effects (whether or not a reasonable tactical decision) substantially prejudiced her defense. In light of the developments in the law since our initial decision in this case, we agree there is a reasonable probability, sufficient to undermine confidence in the verdict, that the result of Walker's trial would have been different (that is, she may have been convicted of voluntary manslaughter rather than second degree murder) had such evidence been presented. Accordingly, we grant the relief requested, vacate the 1991 judgment of conviction and remand Walker to the Los Angeles Superior Court for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Walker's Murder Trial*

#### a. *Trial testimony*

In 1990 Walker, then 48 years old, was charged with the first degree murder of her husband Thomas (Tommy) Walker.[2] The evidence of the events preceding Walker's shooting of Thomas was largely undisputed: On May 13, 1990, after Walker and Thomas returned home from drinking at a local bar, Thomas pointed a shotgun at Walker and told her, "[T]oday will be your last goddamned day on this Earth." Walker fled the house and reported her husband's threat to the Los Angeles County Sheriff's Department. After trying unsuccessfully to speak to Thomas, Deputy Sheriff Dennis Miller told Walker to stay away from the house until her husband had sobered up and settled down. He handed her a business card and instructed her to call the number on the card if there were any more problems. If Walker needed anything from the house, Miller advised her to get it when her husband was not there.

Walker waited several hours until Thomas had left the house. After she confirmed Thomas had again gone to a bar, Walker returned to the house to get her clothes, money and blood pressure medicine.

---

[2] Because Walker and her husband shared the same last name, we refer to the victim by his first name, not out of disrespect but for convenience and clarity. (See *Cruz v. Superior Court* (2004) 120 Cal.App.4th 175, 188, fn. 13 [14 Cal.Rptr.3d 917].)

According to the People's case, after Walker returned home on the evening of May 13, 1990, she called the number listed on Deputy Miller's business card. Los Angeles County Sheriff's Detective Joseph Hartshorne answered the telephone. Hartshorne testified that Walker calmly identified herself, gave her address and then said, "I need help. I'm going to kill my husband." Hartshorne heard no urgency in Walker's voice. Walker told Hartshorne she "was tired of it"; she had a ".25 or something" gun; and, as soon as her husband came through the door, she intended to shoot him. While he was trying to determine the nature of Walker's problem, Hartshorne heard Walker say, in a comparatively rushed tone but without any hint of panic, "He's coming through the door." Two or three seconds later, Hartshorne heard a single gunshot. Other than the gunshot, Hartshorne did not hear any loud noise, a plea for help or arguing. After the gunshot Walker returned to the phone and in a more "hyper" tone told Hartshorne, "There, I did it. I shot him" and will "shoot him again" if he gets up. She also requested Hartshorne call the paramedics. When the police arrived at the home, they found a .25-caliber automatic pistol on the floor along with an instruction manual for the gun.[3]

Teresa Armstrong, a friend of Walker's daughter, testified that in April 1990 Walker had revealed "her problems with Thomas" and explained she could not leave him because "there's a lot of money involved." According to Armstrong, Walker had said if there were any way she could kill her husband she would.

Walker testified in her own defense and insisted the shooting was an accident. She explained that, as Deputy Miller had instructed, she waited for Thomas to leave the house, then returned to retrieve her blood pressure medicine, intending to stay with her adult daughter at the daughter's home. When she heard her husband arrive home, Walker, recalling Thomas's earlier threat, was afraid and called the number listed on Deputy Miller's card. Detective Hartshorne told her Deputy Miller was not there. Walker informed Hartshorne of her husband's earlier threats and told him, "I am afraid. Please get somebody here. I know he is going to kill me and I can't get away. He knows I am here." In response to Hartshorne's inquiry whether she had a gun, Walker told him she had a ".25 gauge shotgun that I hid in the closet," referring to the weapon Thomas had pointed at her earlier.

According to Walker, Hartshorne did not seem to understand the urgency of her telephone call; at times it appeared he was preoccupied and not listening to her. When her husband came in the house, she began to cry and

---

[3] Thomas had a blood-alcohol level of .23 percent at the time of his death.

said, "Tommy, I have the police on the phone." Thomas responded, "That will be your last fucking phone call, bitch." Before she knew it, Thomas had thrown a box on the table. When the lid popped up and Walker saw the box contained a small handgun, she reached for it, not to use the gun herself but to prevent Thomas from getting it. Thomas grabbed her hand at the same time, and the gun discharged. Walker repeatedly insisted she did not intend to shoot Thomas. After the gun fired, she tried to get Thomas to stand up, but he did not move. Walker then returned to the telephone, told Hartshorne she had shot her husband and asked him to please call the paramedics.

Walker also described in her trial testimony the years of physical and emotional abuse she had suffered during her marriage, explaining that Thomas would become physically and verbally abusive whenever he drank alcohol. Walker detailed several episodes of domestic violence she had endured and testified she had left Thomas several times, but always returned to him after he promised things would be better and he would curtail his alcohol consumption.

### b. *The trial court's instructions*

The trial court fully instructed the jury on first degree and second degree murder and—notwithstanding the People's argument the killing could only be a premeditated, first degree murder and the defense theory it was accidental, justifiable homicide—also instructed on voluntary manslaughter, involuntary manslaughter and true (or complete) self-defense, as well as excusable homicide caused by accident and misfortune. (See CALJIC No. 5.00.) The court's general instruction defining voluntary manslaughter included a reference to both sudden quarrel/heat of passion and imperfect self-defense (see CALJIC No. 8.40 [distinguishing murder and voluntary manslaughter]),[4] and it provided several additional instructions regarding sudden quarrel, heat of passion and provocation (see CALJIC Nos. 8.42, 8.43, 8.44), as well as explaining the imperfect-self-defense theory of voluntary manslaughter. In particular, the court properly instructed the jury that fear alone is not sufficient to constitute the heat of passion referred to in the law of manslaughter (see CALJIC No. 8.44), and further advised the jury that an actual, subjective belief in the need to defend oneself negates malice even if a reasonable person in

---

[4] The court instructed the jury, "Every person who unlawfully kills another human being without malice aforethought but with an intent to kill is guilty of voluntary manslaughter in violation of section 192 of the Penal Code. There is no malice aforethought if the killing occurred upon a sudden quarrel or heat or passion or in the honest but unreasonable belief in the necessity to defend one's self against imminent peril to life or great bodily injury."

the same situation seeing and knowing the same facts would not have believed there existed any imminent peril to life.[5]

### c. *Closing argument*

Consistent with their theories of the case, neither the prosecutor nor Walker's counsel addressed at any length the lesser included offenses described in the court's instructions. The prosecutor dismissed the possibility of a guilty verdict on voluntary manslaughter by telling the jury, "This case is not about manslaughter . . . . It is about first degree murder or excusable homicide. . . . The reason it is that, ladies and gentlemen, is because manslaughter doesn't apply. Voluntary manslaughter doesn't apply. Certainly, under the People's version, which you're aware of, but even under the defense version because Mrs. Walker at no time does she—is it her claim that she intended to kill Mr. Walker, that she intended to pull that trigger in fear of imminent peril or self-defense or anything else. Her claim is that she struggled with him over that gun in that fear but that the gun went off accidentally so that's excusable homicide. At no time are you being told even by the defense that she intended to kill Mr. Walker. Therefore, voluntary manslaughter even under the defense version is not present."

For his part defense counsel focused exclusively on Walker's claim the shooting was accidental, insisting Walker "is not guilty of any crime . . . no lesser includeds. She's not guilty." Defense counsel did not discuss the possibility of the jury finding Walker guilty of voluntary manslaughter because, even accepting the People's theory that Walker had waited for Thomas to come into the house and intentionally shot him, the People had failed to prove she was not acting in the honest, albeit unreasonable, belief Thomas intended to kill her. Indeed, Walker's trial counsel actually argued her defense of accident (justification) was factually inconsistent with any claim of self-defense.

### d. *The jury's verdict and sentencing*

On February 11, 1991, after four days of deliberation, the jury found Walker guilty of second degree murder. The jury also found true the special allegation Walker had personally used a firearm in the commission of the

---

[5] At the time of trial CALJIC No. 5.17 provided, "A person who kills another person in the honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury kills unlawfully, but does not harbor malice aforethought and cannot be found guilty of murder. This would be so even though a reasonable man in the same situation and knowing the same facts would not have had the same belief." (CALJIC No. 5.17 (Jan. 1987 rev.) (4th ed. 1979); see *People v. Rogers* (2006) 39 Cal.4th 826, 882–883, fn. 29 [48 Cal.Rptr.3d 1, 141 P.3d 135].)

offense. (Pen. Code, § 12022.5, subd. (a).) A supplemental probation report prepared for sentencing stated, "The victim [Thomas Walker] appears to have been an initiator, willing participant, aggressor or provoker of the incident," and the offense does not appear to be "characteristic of the defendant's [Walker's] behavior. Indeed, it appears to have been the tragic result of the victim's abusive use of alcohol, and the defendant's inability to get immediate and lasting assistance to enable her to deal with her husband's angry, volatile, hostile and threatening behavior." The report concluded, "The court might well find this to be an unusual case, and determine that state prison is not warranted." The trial court at sentencing stated Walker was ineligible for probation but observed it would not grant probation even if it had the statutory authority to do so. The court then imposed an aggregate state prison term of 19 years to life, 15 years to life for the murder plus the middle term of four years for the firearm-use enhancement.

### 2. Walker's Prior Habeas Corpus Petitions

#### a. The 1992 state court petition

In her direct appeal to this court from the judgment of conviction for second degree murder, Walker argued she was denied the effective assistance of counsel "due to her counsel's failure to develop and present battered wife syndrome evidence to support her self defense." At the time Walker filed her reply brief she also filed in this court a petition for writ of habeas corpus, which reiterated her claim of ineffective assistance of counsel and which included a declaration from her trial counsel asserting he had been wrong not to present expert testimony on intimate partner battering and now believed it was relevant to her claim she had grabbed for the gun in self-defense. Trial counsel explained he had been suffering from a serious abdominal infection during the trial and his mind had been primarily on his illness. The petition also included a psychological report, prepared in May 1992, from Dr. Lenore Walker, a leading expert on the psychological effects of intimate partner battering (see *People v. Brown* (2004) 33 Cal.4th 892, 899 [16 Cal.Rptr.3d 447, 94 P.3d 574]), who had interviewed Walker for 12 hours following her conviction.[6]

We considered Walker's petition together with her appeal and, in an opinion authored by Presiding Justice Mildred Lillie, affirmed the judgment and denied the petition, concluding Walker's counsel had not been constitutionally ineffective under the standard articulated by the United States

---

[6] Dr. Walker is not related to petitioner.

Supreme Court in *Strickland v. Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674, 104 S.Ct. 2052]. (*Walker I, supra,* B058840.) Presiding Justice Lillie explained the decision to forgo expert testimony on the psychological effects of intimate partner battering was an inherently tactical one, prompted by Walker's claim the shooting had been an accident. Recognizing expert testimony would have assisted Walker had she claimed she intentionally shot Thomas because she believed he would kill her, and acknowledging such expert testimony may have bolstered Walker's assertions as to her subjective fear of her husband, we held the testimony was not relevant to Walker's claim the shooting was an accident and, as counsel feared, would have undermined Walker's own testimony as to how the shooting had transpired by suggesting Walker had a motive to murder her husband. Alternatively, we held that reversal on grounds of ineffective assistance of counsel was not required because, having disbelieved Walker and rejected her claim of accident, there was no reasonable probability the jury would have reached a more favorable result had it heard expert testimony concerning intimate partner battering and its effects. (*Strickland v. Washington, supra,* 466 U.S. 668.)[7]

### b. *Walker's federal court petitions*

On November 23, 1993 Walker filed a petition for writ of habeas corpus in propria persona in the United States District Court for the Central District of California, challenging her conviction on the ground her trial counsel was ineffective for failing to present expert testimony on the psychological effects of intimate partner battering. On July 19, 1994 the petition was denied without prejudice because it was in improper form. An amended petition was denied in August 1994 on the ground it was filed after the 20-day period authorized by the July 19, 1994 order. A new petition filed later that month was denied in May 1996 for failure to exhaust state court remedies.[8] Walker's

---

[7] On March 10, 1993 the California Supreme Court summarily denied Walker's petition for review of our decision affirming the judgment and denying the petition for writ of habeas corpus.

[8] Although Walker had raised her ineffective assistance of trial counsel claim in her 1993 petition for review to the California Supreme Court, she had focused her arguments on the failure to provide expert testimony. Her petition to the federal district court, while asserting that argument, also alleged ineffective assistance on two additional grounds not raised in her petition to the California Supreme Court: Trial counsel had failed to request jury instructions regarding the abuse Walker had endured and his illness had "permeated the entire trial." The federal district court denied the petition without prejudice, ruling, "[I]f any one of the claims in the current petition is unexhausted, the entire petition must be dismissed. (*Szeto v. Rushen* [(9th Cir. 1983)] 709 F.2d 1340, 1341)."

subsequent petition for writ of habeas corpus to the California Supreme Court was denied on January 28, 1997.

On March 10, 1997 Walker filed a new petition for writ of habeas corpus in the federal district court alleging ineffective assistance of trial counsel for, among other things, failure to provide expert testimony on intimate partner battering. On June 30, 1999 the federal district court denied the petition, adopting the findings and recommendations of the federal magistrate, whose reasoning echoed the analysis in our 1992 opinion.[9]

### 3. *The Initial Petition for Writ of Habeas Corpus Pursuant to Section 1473.5*

On September 23, 2003 Walker filed a new petition for writ of habeas corpus in the Los Angeles Superior Court based on section 1473.5, which authorizes the prosecution of a writ of habeas corpus on the ground expert testimony as to intimate partner battering and its effects was not introduced into evidence at the petitioner's criminal trial and, had it been received, "there is a reasonable probability, sufficient to undermine confidence in the judgment of conviction, that the result of the proceedings would have been different."[10]

On April 1, 2004 the superior court (Hon. David S. Wesley) denied the petition on two grounds: First, the court cited section 1473.5, subdivision (c), which provides the denial of a prior habeas corpus petition because the omission of expert testimony relating to intimate partner battering and its effects was not prejudicial is a ground for denial of a section 1473.5 petition. Second, the court concluded, as had we in 1992 and the federal district court

---

[9] Walker's petition for certificate of appealability (28 U.S.C. § 2253(c)(2)) was denied on August 25, 1999.

[10] Section 1473.5 provides in part: "(a) A writ of habeas corpus also may be prosecuted on the basis that expert testimony relating to intimate partner battering and its effects, within the meaning of Section 1107 of the Evidence Code, was not received in evidence at the trial court proceedings relating to the prisoner's incarceration, and is of such substance that, had it been received in evidence, there is a reasonable probability, sufficient to undermine confidence in the judgment of conviction, that the result of the proceedings would have been different. . . . [¶] (b) This section is limited to violent felonies as specified in subdivision (c) of Section 667.5 that were committed before August 29, 1996, and that resulted in judgments of conviction after a plea or trial as to which expert testimony admissible pursuant to Section 1107 of the Evidence Code may be probative on the issue of culpability. [¶] (c) If a petitioner for habeas corpus under this section previously filed a petition for writ of habeas corpus, it is grounds for denial of the new petition if a court determined on the merits in the prior petition that the omission of expert testimony relating to battered women's syndrome or intimate partner battering and its effects at trial was not prejudicial and did not entitle the petitioner to the writ of habeas corpus."

more recently, the "evidence is irrelevant in light of petitioner's claims at trial that she accidentally shot and killed her husband during a struggle for the gun."

4. *The Instant Petition for Writ of Habeas Corpus Based on Section 1473.5*

On April 28, 2006 Walker filed the instant petition for writ of habeas corpus contending the failure to provide expert testimony as to the psychological effects of intimate partner battering prejudiced her defense and entitles her to a new trial under section 1473.5. As she did in all of her prior petitions, Walker attached to the instant petition the psychological report (prepared in 1992) of Dr. Lenore Walker. Dr. Walker had administered several psychological tests to Walker following her conviction and concluded from those results and her extended interview with Walker that Walker was a "battered woman" who lived for years in an abusive relationship and suffered from " 'battered woman syndrome' . . . a subcategory of post-traumatic stress disorder." Dr. Walker stated that, had she been called as an expert witness at Walker's murder trial, she would have testified that women like Walker either are or perceive themselves to be in imminent danger in circumstances like those Walker described.

Walker also attached her own declaration relating her history of being victimized by Thomas, as well as other men in her life, and asserting, consistent with her trial testimony, she had reached for the gun in self-defense because she feared Thomas was going to use it to kill her and that, when she did, the gun accidentally discharged.

After requesting and receiving informal briefing from the People on the matter, on September 28, 2006 we issued an order to show cause why the requested relief should not be granted. The People filed their return, and Walker filed her traverse.

## DISCUSSION

1. *The Admissibility of Expert Testimony on the Effects of Intimate Partner Battering and Section 1473.5*

a. *The nature and effects of intimate partner battering*

The effects of intimate partner battering, frequently, albeit inartfully, referred to as "battered women's syndrome,"[11] have been defined as " ' "a

---

[11] See footnote 1, *ante.*

series of common characteristics that appear in women [or men] who are abused physically and psychologically over an extended period of time by the dominant male [or female] figure in their lives." ' " (*Humphrey, supra,* 13 Cal.4th at pp. 1083–1084; see also *People v. Romero* (1994) 8 Cal.4th 728, 735, fn. 1 [35 Cal.Rptr.2d 270, 883 P.2d 388] [the effects of intimate partner battering manifest as " 'a "pattern of responses and perceptions presumed to be characteristic of women who have been subjected to continuous physical abuse by their mate[s]," ' " quoting Note, *Battered Women Who Kill Their Abusers* (1993) 106 Harv. L.Rev. 1574)].)

From a legal perspective, evidence of intimate partner battering and its psychological effects can reduce an intentional killing from murder to voluntary manslaughter by negating the element of malice. (*Humphrey, supra,* 13 Cal.4th at p. 1086 [expert testimony on effects of intimate battering is relevant to support imperfect self-defense—that defendant genuinely but unreasonably believed she was in imminent danger of serious bodily injury].) Such expert testimony can also support a defendant's theory of justifiable homicide or true self-defense by enabling the jury to find the battered woman or man " 'is particularly able to predict accurately the likely extent of violence in any attack,' " information that could " 'significantly affect the jury's evaluation of the *reasonableness* of defendant's fear for her[or his] life. [Citation.]' " (*Ibid.*; see also Judicial Council of Cal. Crim. Jury Instns. (2006) CALCRIM No. 851.)[12]

### b. *Evidence Code section 1107*

For many years criminal defendants accused of committing violent crimes against their batterers were either denied the ability to use, or did not fully perceive the persuasive force of, expert testimony to assist the trier of fact in understanding the psychological effects of intimate partner battering to negate the malice element of murder. To address that ongoing problem, the Legislature added section 1107 to the Evidence Code, effective January 1, 1992, expressly authorizing the admission of expert testimony regarding intimate partner battering and its effects. (See Stats. 1991, ch. 812, § 1, pp. 3612–3613; see *People v. Brown, supra,* 33 Cal.4th at p. 902 ["trial courts

---

[12] CALCRIM No. 851 provides in part that expert testimony concerning intimate partner battering and its effects may be considered by the jury "in deciding whether the defendant actually believed that (he/she) needed to defend (himself/herself) against an immediate threat of great bodily injury or death, and whether that belief was reasonable or unreasonable. [¶] When deciding whether the defendant's belief was reasonable or unreasonable, consider all the circumstances as they were known by or appeared to the defendant. Also consider what conduct would appear to be necessary to a reasonable person in a similar situation with similar knowledge." (See also CALJIC No. 9.35.1 (2005 re-rev.) ["Cautionary Instruction—Intimate Partner Battering"].)

often continued to exclude" expert evidence on intimate partner battering and its effects; accordingly, "the Legislature in 1991 enacted [Evidence Code] section 1107 to ensure the admissibility of expert evidence on domestic violence"].) As one of the authors of the legislation to add Evidence Code section 1107 explained, "This bill is necessary to ensure that all relevant evidence is admitted in a criminal case. Although there is case law that suggests that this testimony should be admissible, the great majority of judges exclude it. The measure is merely intended to allow a jury to consider all the evidence in a particular case." (Assem. Com. on Public Safety, Rep. on Assem. Bill No. 785 (1991–1992 Reg. Sess.) as introduced Apr. 9, 1991.)

In its current form Evidence Code section 1107, subdivision (a), provides, "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge."[13]

#### c. *Section 1473.5*

 Recognizing the omission of expert testimony on the psychological effects of intimate partner bartering could have prejudiced criminal defendants tried for committing violent felonies prior to January 1, 1992, the effective date of Evidence Code section 1107, in 2001 the Legislature added section 1473.5, authorizing the prosecution of a petition for writ of habeas corpus on the specific ground expert testimony relating to intimate partner battering "within the meaning of Section 1107 of the Evidence Code" had not been received into evidence at trial and there is a "reasonable probability, sufficient to undermine confidence in the judgment of conviction, that the result of the proceedings would have been different" had such expert testimony been introduced. (Stats. 2001, ch. 858, § 1.) California Senator Betty Karnette, in introducing the legislation to add section 1473.5, observed

---

[13] Although Evidence Code section 1107 has been amended four times since 1991, the basic provision authorizing admission of expert testimony regarding the effects of intimate partner battering contained in subdivision (a) has remained substantially unchanged, except for replacement of the term "battered women's syndrome" with "intimate partner battering and its effects." When first added in 1991, Evidence Code section 1107, subdivision (a), read, "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding battered women's syndrome, including the physical, emotional, or mental effects upon the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." (Stats. 1991, ch. 812, § 1, pp. 3612–3613.)

that some women who suffered from the effects of intimate partner battering and who had been convicted prior to the addition of Evidence Code section 1107 "might have been convicted of [voluntary] manslaughter instead, had [intimate partner battering] evidence been introduced at their trial. As a result, a number of women convicted prior to 1992[14] are serving sentences that are substantially longer than those women convicted today of the identical offense." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 799 (2001–2002 Reg. Sess.) as introduced Feb. 23, 2001.)

### 2. *Walker Is Entitled to Relief Under Section 1473.5*

#### a. *Our discretion to consider Walker's petition*

■ Although an order granting habeas corpus relief has res judicata effect, an order denying the writ does not. (*In re Clark* (1993) 5 Cal.4th 750, 773 [21 Cal.Rptr.2d 509, 855 P.2d 729].) Nonetheless, courts ordinarily will not reconsider the merits of issues raised and determined in prior habeas corpus proceedings absent a change in the facts or law substantially affecting the petitioner's rights. (See *id.* at p. 769 [" 'It is the policy of this court to deny an application for habeas corpus which is based upon grounds urged in a prior petition which has been denied, where there is shown no change in the facts or the law substantially affecting the rights of the petitioner. [Citations.] . . .' "].) This general principle is incorporated in section 1473.5, subdivision (c), which provides "it is grounds for denial" of a new petition under this section if a prior habeas corpus petition has been denied because omission at trial of expert testimony on intimate partner battering and its effects "was not prejudicial and did not entitle the petitioner to the writ of habeas corpus."

As the superior court found in denying Walker's section 1473.5 petition, our 1992 decision affirming Walker's conviction on direct appeal and denying her concurrently filed petition for writ of habeas corpus asserting ineffective assistance of counsel held not only that the decision of Walker's trial counsel to forgo expert testimony on intimate partner battering was inherently tactical—to avoid putting on an inconsistent defense that would have undermined Walker's claim the shooting was an accident—but also that counsel's

---

[14] When added in 2001 section 1473.5 was limited to individuals who had pleaded guilty or were convicted prior to January 1, 1992, the effective date of Evidence Code section 1107. (See Stats. 2001, ch. 858, § 1.) In 2004 section 1473.5 was amended to apply to individuals charged with violent felonies committed before August 29, 1996, the date of the California Supreme Court's decision in *Humphrey, supra,* 13 Cal.4th 1073.

tactical decision was not prejudicial. Ordinarily, under section 1473.5, subdivision (c), that finding of lack of prejudice would be a sufficient ground to deny the instant petition.[15]

■ However, as the Attorney General recognizes, the legislative authorization to deny a section 1473.5 petition on the ground a prior habeas corpus petition was denied for lack of prejudice is permissive, not mandatory. Section 1473.5, subdivision (c), does not state the new petition shall or must be denied on that basis. (See *People v. Loeun* (1997) 17 Cal.4th 1, 9 [69 Cal.Rptr.2d 776, 947 P.2d 1313] [" 'In interpreting statutes, we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law' "]; see also *People v. Farell* (2002) 28 Cal.4th 381, 386 [121 Cal.Rptr.2d 603, 48 P.3d 1155] [best indication of legislative intent appears in the language of the enactment]; *People v. Toney* (2004) 32 Cal.4th 228, 232 [8 Cal.Rptr.3d 577, 82 P.3d 778] ["If the statutory language is unambiguous, 'we presume the Legislature meant what it said, and the plain meaning of the statute governs.' [Citations.]"].)

Moreover, even if the phrase "it is grounds for denial" were ambiguous (an argument the People do not make), the legislative history materials relating to the various iterations of section 1473.5 reinforce our conclusion as to the permissive nature of the statute. (See *Day v. City of Fontana* (2001) 25 Cal.4th 268, 274 [105 Cal.Rptr.2d 457, 19 P.3d 1196] ["Although we might well stop here since the facts do not appear to raise any ambiguity or uncertainty as to the statute's application, we shall, 'in an abundance of caution, . . . test our construction against those extrinsic aids that bear on the enactors' intent.' [Citation.] As we shall demonstrate, the legislative history materials reinforce our conclusion that the statute applies to plaintiff's action."].) For example, in introducing the legislation that would become section 1473.5, Senator

---

[15] Walker asserts section 1473.5, subdivision (c), is not implicated because the prior opinion of this court and the subsequent decision by the federal district court denying Walker habeas corpus relief were based on findings counsel was not ineffective. Although our analysis also included a determination that any error concerning the omission of expert testimony regarding intimate partner battering and its effects was not prejudicial, Walker insists the prejudice analysis associated with a constitutionally ineffective assistance of counsel claim is different from, and more demanding than, the standard of prejudice articulated in section 1473.5, subdivision (a). Walker is simply wrong: The statutory standard of prejudice is identical to that used to evaluate a claim of constitutionally ineffective assistance of counsel. (Compare *Strickland v. Washington, supra,* 466 U.S. at pp. 693, 694 [to show trial counsel's errors were prejudicial, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding"; "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome"] with § 1473.5, subd. (a) [prejudice is established by showing that, had the expert testimony on intimate partner battering been received into evidence, "there is a reasonable probability, sufficient to undermine confidence in the judgment of conviction, that the result of the proceedings would have been different."].)

Karnette stated the statute was purposefully directed to those whose prior habeas corpus petitions based on ineffective assistance of counsel were denied in an atmosphere when intimate partner battering and its implications were not well understood: "There is simply no reason to penalize women who had a good defense to killing their abusive spouses simply because at the time their convictions became final, the factual basis for the defense was so little understood that the courts are not willing to fault trial counsel for not presenting it." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 799 (2001–2002 Reg. Sess.) as introduced Feb. 23, 2001.) In addition, when section 1473.5 was amended in 2004 to change "battered women's syndrome" to "intimate partner battering and its effects," the legislative counsel observed, "Existing law makes it a ground[] for denial of a new petition that a court determined on the merits of a prior petition for a writ of habeas corpus that the omission of evidence relating to battered wom[e]n's syndrome at trial was not prejudicial and did not entitle the petitioner to the writ of habeas corpus. [¶] This bill would *permit* this denial if the court found that the omission of expert testimony relating to battered women's syndrome or battering and its effects at trial was not prejudicial and did not entitle the petitioner to the writ of habeas corpus." (Legis. Counsel's Dig., Sen. Bill No. 1385 (2003–2004 Reg. Sess.), italics added.)

Thus, in an appropriate case—and certainly to prevent the injustice identified by the Legislature in enacting section 1473.5—we should exercise our discretion to consider the merits of a habeas corpus petition brought for the first time under section 1473.5, notwithstanding the denial of a prior petition based on a finding that counsel's decision to omit the expert testimony neither fell below an objective standard of reasonableness nor was prejudicial.

> b. Barton *and* Humphrey*: Clarification of imperfect self-defense as a lesser included offense to murder and the expanded role of expert testimony on battering and its effects*

The linchpin for our 1992 opinion holding the tactical decision of Walker's trial counsel not to present evidence of intimate partner battering and its effects was both reasonable and nonprejudicial was the indisputable proposition that such evidence was factually inconsistent with Walker's defense that she grappled for the gun and it accidentally fired, killing Thomas: "Counsel recognized that on this evidence he could not claim defendant was a battered woman who intentionally shot her husband after years of abuse because she feared that when he came in the door he intended to beat her again, and at the same time argue that she was innocent of any crime because she did not have the gun, during the struggle for the gun it accidentally discharged, she did not pull the trigger and she did not intend to kill [Thomas]." (*Walker I, supra*, B058840.) Distinguishing Walker's case from *People v. Aris* (1989) 215

Cal.App.3d 1178, 1185 [264 Cal.Rptr. 167] in which the defendant testified she intentionally shot her abusive husband while he was asleep " '[b]ecause I felt when he woke up that he was then going to hurt me very badly or even kill me,' " Presiding Justice Lillie explained, "[T]here is in the record no admission by petitioner of the facts necessary to justify evidence of the 'battered woman syndrome.' This points up the difficulty with petitioner's suggestion that trial counsel on the one hand could have argued she was innocent because the gun accidentally discharged, and on the other, was guilty of voluntary manslaughter (imperfect self-defense) because she intentionally killed him as the result of long years of abuse and she was afraid he would eventually kill her." (*Walker I, supra,* B058840.)

■ The premise of our decision—that it was necessary for Walker herself to testify she intentionally shot Thomas for expert evidence regarding battering and its psychological effects to be admissible in support of an imperfect self-defense theory of voluntary manslaughter—was refuted by the Supreme Court three years later in *Barton, supra,* 12 Cal.4th 186. In *Barton* the defendant fatally shot the victim during a confrontation in a parking lot after the victim had threatened to run the defendant's daughter's automobile off the road. The defendant claimed he had seen a knife in the victim's hand, displayed his own semiautomatic pistol (which he was legally carrying) to hold the victim for the police, but then fired reflexively (that is, accidentally) while stepping backward to avoid the victim's threatening movement. (*Id.* at pp. 192–193.) On appeal from his conviction for voluntary manslaughter, the defendant argued the trial court had erred in instructing the jury, sua sponte and over his objection, with the lesser included offense of voluntary manslaughter based on evidence in the People's case that a heated argument had preceded the shooting and that he had intentionally shot the victim to defend himself. Disapproving *People v. Wickersham, supra,* 32 Cal.3d at page 329 (because unreasonable self-defense is a defense and not a lesser included offense, trial court has no obligation to instruct sua sponte on imperfect self-defense), and reaffirming its earlier pronouncements in *People v. Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913],[16] the court held that, so long as there is evidence, whether in the People's case or in the defense case or both, from which a jury could infer the lesser included offense of voluntary manslaughter, whether based on heat of passion or imperfect self-defense, the voluntary manslaughter instruction must be given, even when it is inconsistent with the defendant's own theory of the case, and the defendant asks, as a matter of trial strategy, the instruction not be given. (*Barton,* at pp. 201, 202–204.) In reaching this conclusion, the court made clear that imperfect self-defense is not a defense at all, but rather a lesser included offense to murder. (See *id.* at p. 201.)

---

[16] *People v. Sedeno, supra,* 10 Cal.3d 703 was overruled on another ground in *People v. Breverman* (1998) 19 Cal.4th 142, 165 [77 Cal.Rptr.2d 870, 960 P.2d 1094].

■ *Barton, supra,* 12 Cal.4th 186, thus establishes that, so long as there is substantial evidence from which a jury can find imperfect self-defense and thereby reduce a murder to voluntary manslaughter, the jury must be given that opportunity, even if imperfect self-defense is inconsistent with a defendant's theory of the case and directly at odds with the defendant's testimony describing how the crime occurred. (*Id.* at pp. 201–202 [jury could reasonably discount defendant's self-serving testimony that gun had accidentally discharged and conclude killing occurred in unreasonable but good faith belief that defendant had to defend himself];[17] see also *People v. Breverman, supra,* 19 Cal.4th at p. 163, fn. 10 ["substantial evidence of heat of passion and unreasonable self-defense may exist, and the duty to instruct sua sponte may therefore arise, even when the defendant claims that the killing was accidental, or that the states of mind on which these theories depend were absent"].) Accordingly, if the People have charged the defendant with murder, whatever the defendant's theory of the case and whatever her testimony, evidence that the defendant may have acted in the actual belief in the need for self-defense is relevant; and, if such evidence has been presented, it is the People's burden to prove beyond a reasonable doubt the defendant committed murder rather than voluntary manslaughter.

The foundation for our 1992 denial of Walker's habeas corpus petition on the ground of no prejudice was further eroded the year after *Barton* by the Supreme Court's decision in *Humphrey, supra,* 13 Cal.4th at pages 1086 through 1087, which construed Evidence Code section 1107 and held expert testimony concerning intimate partner battering and its effects is relevant not only to the defendant's credibility but also to the determination of both the subjective existence and objective reasonableness of a defendant's belief in the need to defend herself or himself. Thus, even though Walker testified the gun fired accidentally, she also testified that, because of prior beatings by her husband and his threat to kill her earlier that day, she feared for her life when he reentered their home on the evening of May 13, 1990. Under *Humphrey* expert testimony concerning "the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence" (Evid. Code, § 1107, subd. (a)) would have assisted the jury in assessing the nature and extent of that fear and permitted it to properly apply the trial court's instructions on murder and voluntary manslaughter, including its instructions on imperfect self-defense, to the testimony not only of

---

[17] Quoting from an earlier Supreme Court decision, the *Barton* court explained, " '[A] defendant has no legitimate interest in compelling the jury to adopt an all or nothing approach to the issue of guilt. Our courts are not gambling halls but forums for the discovery of truth.' [Citation.]" (*Barton, supra,* 12 Cal.4th at p. 204.) While a defendant is given great leeway to make tactical choices, tactical considerations may not be invoked "to deprive the jury of the opportunity to consider whether the defendant is guilty of a lesser offense included within the crime charged." (*Id.* at p. 190.)

Walker herself but also of Detective Hartshorne concerning the telephone conversation he had with Walker when the shooting occurred.

 c. *A reasonable probability exists that, if presented with the expert testimony on intimate partner battering and its effects, the jury would have found Walker guilty of the lesser included offense of voluntary manslaughter*

As discussed, the People's case against Walker rested on its theory, supported primarily by Detective Hartshorne's testimony, that Walker armed herself with a handgun, waited for Thomas to reenter the home and then intentionally shot him. In convicting Walker of second degree murder, the jury disbelieved Walker's defense that the shooting was an accident. However, the jury also rejected the People's assertion—fully supported by the evidence—that, if the shooting was not an accident, it had to be premeditated murder. Had the jury heard not only Walker's own description of her years of domestic abuse at the hands of Thomas but also expert testimony as to the effects of intimate partner battering, it may well have found that, while the shooting was intentional, it was the result of a genuine (if not reasonable) fear for her imminent safety. Dr. Walker's report explains she would have testified that persons battered by their intimate partners suffer from something akin to posttraumatic stress disorder, which escalates after each beating, such that, whether or not in imminent danger, the battered partner genuinely feels he or she must kill the batterer in order to save his or her own life.[18] Faced with expert testimony that would have directly rebutted the People's theory that Walker did not kill Thomas out of fear and would not have stayed with him had she actually feared him,[19] there is a reasonable probability, notwithstanding the jury's rejection of Walker's accident theory, the jury would have found her guilty of voluntary manslaughter rather than second degree murder.

[18] If expert testimony regarding intimate partner battering and its effects had been introduced at Walker's trial, a properly instructed jury would have been told not only that to establish Thomas's death is murder the People must prove beyond a reasonable doubt Walker intentionally and unlawfully killed Thomas and did not do so in the actual, even if unreasonable, belief it was necessary to defend herself against imminent peril to her life or great bodily injury, but also that the expert testimony should be considered in determining whether Walker actually believed in the necessity to use force to defend herself against imminent peril to life or great bodily injury and whether such a belief was reasonable or unreasonable. (See *People v. Jaspar* (2002) 98 Cal.App.4th 99, 111, fn. 6 [119 Cal.Rptr.2d 470]; see also CALCRIM No. 851.)

[19] The prosecutor attempted to undermine Walker's credibility by suggesting that, if Thomas was so abusive and Walker was actually afraid, she would not have stayed with him: "I suppose I don't understand. . . . Mrs. Walker everything that I've heard so far from you suggests a very—an individual who's not worthy of love. I want to know what was there about Mr. Walker that was worthy of your love and why you state you love him." "You weren't held captive or you didn't feel like you were captive of that home that you couldn't leave for some [reason]? You didn't fear bodily harm would come to you if you were to try and leave Mr. Walker did you?"

## DISPOSITION

The 1991 judgment of conviction is vacated, and Hudie Joyce Walker is remanded to the superior court for a new trial.

Johnson, J., and Woods, J., concurred.

On March 6, 2007, the opinion was modified to read as printed above.