Filed 12/6/21  P. v. Gaoa CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SENTER JOHN GAOA,<br><br>Defendant and Appellant. | F078199<br><br>(Super. Ct. No. MCR051903)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Madera County.  Joseph A. Soldani, Judge.

Meredith J. Watts, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and A. Kay Lauterbach, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

In the early morning hours of June 26, 2015, defendant Senter John Gaoa inflicted corporal injury on his girlfriend and vandalized her vehicle. Proceeding to trial on a theory of self-defense, defendant offered an expert on "intimate partner battering" to support his defense. The trial court excluded the testimony as irrelevant because defendant, while testifying at trial, never claimed he was defending himself or feared injury from his girlfriend. Thereafter, the trial court denied defense counsel's request to recall defendant to supplement his testimony. A jury found defendant guilty of inflicting corporal injury on a cohabitant and misdemeanor vandalism, and the court found true the prior conviction allegations.

The trial court partially rejected defendant's invitation to strike his prior convictions, denied probation, and sentenced defendant to 25 years to life under the "Three Strikes" law (Penal Code, §§ 667, subds. (b)–(i), 1170.12)[1] and ordered defendant pay fines, fees, and assessments totaling $890 for count 1 and $40 for count 2.

Defendant contends on appeal (1) the trial court abused its discretion in denying his request to recall himself to supplement his trial testimony; (2) the trial court abused its discretion in denying his motion for mistrial after excluding testimony from his expert witness; (3) defense counsel was ineffective in failing to establish the foundation necessary for admission of expert testimony on intimate partner battering; (4) the trial court erred in instructing the jury that they could infer defendant's consciousness of guilt from his false statements to the police without also sua sponte instructing as to the effect of defendant's voluntary intoxication; (5) the trial court abused its discretion in failing to strike all of his prior serious felony convictions; (6) the trial court violated due process by imposing fines, fees, and assessments without determining whether defendant has the ability to pay them; and (7) we should vacate any balance of the $750 presentence report

---

[1]     Statutory references are to the Penal Code unless otherwise noted.

fee imposed pursuant to former section 1203.1b and the $108.19 booking fee imposed pursuant to former Government Code section 29550.2, unpaid as of July 21, 2021, in light of Assembly Bill No. 1869 (2019–2020 Reg. Sess.).

The People respond that the trial court properly denied defendant's request to recall himself, motion for mistrial, and invitation to strike his prior serious felony convictions, and that counsel was not ineffective in either laying an adequate foundation for expert testimony or failing to request a jury instruction on the effect of voluntary intoxication. The People, however, concede that remand is necessary for the trial court to determine whether defendant is able to pay various fines, fees, and assessments. In addition, the People argue that remand is necessary because the trial court failed to order defendant to pay restitution and a restitution fine as to counts 1 and 2 and a criminal conviction assessment as to count 2 only. The People also concede that the judgment pertaining to the unpaid balance of the presentence report and booking fees should be vacated.

We agree with the People's positions, except for its concession as to the need for remand and with respect to challenging the trial court's error, if any, in failing to order victim restitution or impose a restitution fine. We find the trial court did not err in ordering fines, fees, and assessments without an ability to pay hearing. We further find that the People forfeited their challenge to the restitution fine by failing to object in the trial court. We agree that we may modify the judgment to reflect mandatory victim restitution but decline to remand for a restitution hearing because both the People and victim may address the amount of restitution by filing the appropriate motion in the trial court. (See § 1202.46.)

We therefore modify the judgment to impose the mandatory $40 court operations assessment and $30 criminal conviction assessment, increasing the total fine for count 2 to $110, and modify the judgment as to counts 1 and 2 to order defendant to pay direct victim restitution in an amount to be determined by the probation department to the

3.

victim identified in the presentence report or, if the victim has received assistance from the California Victim Compensation Board, to be deposited into the Restitution Fund. We vacate any portion of the judgment requiring payment of any balance of the $750 presentence report fee and $108.19 booking fee unpaid as of July 1, 2021, and affirm the judgment as modified in all other respects.

## PROCEDURAL BACKGROUND

Originally charged by complaint, defendant was held to answer after his preliminary hearing on July 17, 2015. The Madera County District Attorney filed an amended information on September 27, 2017, charging defendant with infliction of corporal injury on a cohabitant (§ 273.5, subd. (a); count 1) and misdemeanor vandalism (§ 594, subd. (a); count 2). As to count 1, the amended information alleged six prior "strike" convictions within the meaning of the Three Strikes law (§ 667, subds. (b)–(i)). Defendant pled not guilty to the charges and denied all allegations in the amended information.

After an eight-day trial, a jury convicted defendant of both counts on May 3, 2018. That same day, defendant waived his right to a jury trial regarding his prior convictions, and the court found true the prior serious felony conviction allegations.

The trial court sentenced defendant on September 14, 2018, after hearing testimony and argument on his invitation to strike his prior serious felony convictions. The trial court partially granted defendant's invitation by striking two convictions arising from the same act in his 1988 case. The trial court denied probation and sentenced defendant to a total term of 25 years to life on count 1. Also, as to count 1, the trial court ordered defendant to pay $890 in fines, fees, and assessments. The trial court ordered a separate $40 fine pursuant to section 1202.5.

This timely appeal followed on September 20, 2018.

**FACTS**

I.      **People's Case**

A.      **Phyllis R.'s Testimony**

Phyllis R. testified she worked at Mule Creek State Prison, which is a two- and one-half-hour commute from her house. She arrived home on June 25, 2015, at approximately 4:30 p.m., after stopping at a grocery store. Defendant, her boyfriend of four years, lived with her and was home when she arrived. After putting the groceries away, she took a nap. Awaking at approximately 10:00 p.m., she noticed defendant had taken her truck. He did not come home before she went to bed.

About 3:00 a.m. or 4:00 a.m., Phyllis awoke to loud music and heard her truck outside. She went outside and found defendant was drunk, angry, and slurring his speech. Defendant followed her back into the house as she attempted to calm him down. He acted jealous, yelling and cussing, and accused her of doing something bad. She led him into the bedroom, telling him not to be upset and that they would talk in the morning. Defendant calmed down and they went to bed. Five or ten minutes later, defendant grabbed her by the hair and dragged her off the bed. He then threw her against the dresser, continued to hold onto her hair, and they both fell on the bed. She tried to kick him off, but he still had her by the hair. Defendant hit her in the face and, when she turned her head, hit her in the back of the head. Defendant then let go of her and started calling her names and accusing her of going out with other people. He was still angry and went outside.

Phyllis found her phone and immediately called 911. She was angry because defendant had hit her and was out of control. At that time, she heard defendant go out the front door and then the sounds of glass breaking and her planters hitting the window. Defendant damaged four planters. After the police came, Phyllis saw that her car's

windshield was broken and the side mirrors were knocked off. Her car had been fine when she drove home from work the day before.

Phyllis testified that defendant had blackened her eye and it stayed bruised for one and one-half weeks, causing her to miss three days of work. She also had bruises on her arms and a bump on her leg.

### B.     The 911 Call

A police dispatcher authenticated the 911 call that Phyllis made, and the prosecutor played the call for the jury. Phyllis's testimony was consistent with the statements she made to the dispatcher. During the call, defendant reentered the house and could be heard on the recording yelling, "[W]ho are you talking to?" He said, "(Unintelligible)…your boyfriend? Girlfriend? Well, fuck you! You hear me? I'm her boyfriend!" Before leaving the house again, he yelled, "Fuck you and that motherfucker, then."

### C.     Defendant's Statements to Police

Officer David Herspring responded to defendant's residence. He saw the broken pots and planters in front of the residence, a broken garage window with soil and pots nearby, and a broken pot on the hood of a vehicle with a broken windshield. He also saw defendant lying on the sidewalk near the residence. Defendant appeared to be asleep but easily woke when Herspring asked defendant if he was okay.

After initially contacting defendant, Herspring entered the residence and spoke with Phyllis. He observed that Phyllis had a black eye and a bruise on her chin. The bedroom appeared disheveled and the officer observed items on the floor that had been knocked from the dresser.

Officer Herspring recontacted defendant outside the residence. He believed that defendant was intoxicated as he was slurring words, unsteady on his feet, and smelled of alcohol. Herspring identified the recording of his contact with defendant that morning,

6.

and the recording was played for the jury. In pertinent part, defendant answered Herspring's questions as follows:

"[Herspring]: How much have you had to drink tonight?

"[Defendant]: Uh, two, uh, one forty ounce, and uh, I had a pint, of, uh, tequila. [¶] … [¶]

"[Herspring]: Okay, well, when you came home, what happened?

"[Defendant]: I just got here.

"[Herspring]: Okay, how did all the planters get broken?

"[Defendant]: Because, uh, cuz she wouldn't open this fucking door.

"[Herspring]: Okay, how come she's got a big black eye on her face?

"[Defendant]: What?

"[Herspring]: Do you remember being in her bedroom throwing her around and punching her in the head?

"[Defendant]: I didn't get in the house yet.

"[Herspring]: You what?

"[Defendant]: I didn't get into the house yet. I didn't, I…

"[Herspring]: Oh, you were in the house. Our dispatcher could hear you in the house.

"[Defendant]: I wasn't in the house, I was outside, hitting the pots.

"[Herspring]: So, so, she, she broke, she blackened her own eye tonight? You didn't blacken her eye?

"[Defendant]: No. [¶] … [¶]

"[Defendant]:No, I do not hit her. I did not, I didn't (inaudible) get in the house.

"[Herspring]: Okay.

"[Defendant]: I was outside with the pots and the plants.

"[Herspring]: So you threw the pots and plants?

7.

"[Defendant]: (Inaudible) ….right here.  Right here.  She wouldn't let me inside the house.

"[Herspring]:  Okay.  So you never made it in the house?

"[Defendant]:  No.

"[Herspring]:  Okay.  The big ol' shiner that she's got that looks real fresh, right in her face, it's nice and deep purple, you didn't do that?

"[Defendant]:  No.

"[Herspring]:  Cuz you never made it in the house.

"[Defendant]:  No."

### D.     Jail Calls Between Defendant and Phyllis

The prosecutor introduced several calls between defendant and Phyllis into evidence.  During one call on June 28, 2015, Phyllis said, "Senter you wanna see - you know what you did to my face?"  Defendant replied, "Babe - babe - I… [¶] … [¶] …blacked - babe - babe - I didn't do that."  Phyllis replied, "Senter.  Don't you blame me at all.  I did nothing to you Senter."  Defendant replied, "I know."  Later in the call, Phyllis said, "Senter.  I did nothing to you.  I didn't deserve to get hit like a man."  Defendant replied, "No.  No you don't."  During one point in the call, Phyllis asked, "What about what you're costin' me?"  Defendant replied, "I know I cost you everything."  After she described her black eye, defendant responded, "Fuck.  I did not do … [¶] … [¶] that wasn't me."  When asked who was responsible, defendant replied, "It's that person that shoulda went to, uh, anger management."

During the same call, defendant described some earlier fights between he and Phyllis:

"[Defendant]:  … How many times - we went through - I (unintelligible) - you got on me like - like beat the fuck outa me?  Did I - did I say anything?  No.  I toed up with you.  [¶] … [¶]

"[Defendant]:  … I went with you.  I didn't call the police on you.  I didn't go and do nothing with you.  I didn't even leave you.  Even though I knew that I'm being disrespected for myself with my girl beatin' on me.

8.

"[Phyllis]: I didn't…

"[Defendant]: Slappin' on me - punch me in the face.

"[Phyllis]: I did not do anything to you Senter. I did not.

"[Defendant]: Put me in the hospital."

Additionally, Phyllis told the defendant, "There was no excuse for you to come home and start beating me down," and defendant replied, "I fucked up. No - no, I didn't beat you down. Don't say that - don't say that." Phyllis told defendant, "even that night … I tried calmin' you down." Defendant later told her, "I don't even know… [¶] … [¶] …how I got home. I don't even know how I got to the jailhouse. See?"

During a call between Phyllis and defendant on July 1, 2015, defendant acknowledged, "I know I did it - I know - I know I did it - I know I did it." In response to Phyllis stating that she did not deserve being hit, defendant replied, "I know … I know and I'm sorry -- okay?" During the conversation concerning the incident, defendant said, "You know I - you know I don't mean to. You know I never do that," and acknowledged he needed to stop drinking. Defendant said, "I'm sorry. I'm sorry so bad," when Phyllis reminded him of her black eye. He also acknowledged, "I will change (unintelligible) shit that happened and I was wrong for that. I was wrong for that."

During an additional call on July 28, 2015, regarding the incident defendant explained:

> "And I confess. And I - I was using. I was in denial. I was using behind your back. And I became a liar, a liar and a liar, a thief. I messed up. …I was taking that jealousy to extreme, you know,… I can't handle your job choice. You know? That jealousy got the best of me. … I messed up. I crossed that line and I – I can't (unintelligible) over and over what I did to you…. Something you know I never thought I'd do. And I did it. And you know to this day I don't remember none of it."

## II.  Defense Case

### A.  Defendant's Testimony

Defendant testified that on the night before the incident, he had taken Phyllis's truck from her driveway.  He also took her bank card and withdrew $40 that he used to purchase marijuana, forty ounces of Old English malt liquor, and a bottle of tequila. Defendant believed that Phyllis would be angry when he returned home.  They had numerous arguments in the four years they had been dating, mostly because he was jealous and would ask her about text messages or phone calls that she received.  During these fights, she would call him names, slap him, and hit him.

Defendant admitted that he had been convicted of forcible rape and kidnapping, but he had never hit Phyllis before.  Defendant had observed his father hit his mother while growing up and resolved to never hit his girlfriend.  During their fights, Phyllis would punch him, bruise his lip, and one time she hit him over the head with his cane and, when it broke, she used the broken end to stab him in the shoulder.  He received treatment at an emergency room for a bruised shoulder after the cane incident.  When asked if he had hit Phyllis the morning of June 26, 2015, defendant responded, "Well, to this day I still don't believe it, but I did, you know."

The prosecutor asked defendant if he remembered what happened.  He replied, "Well, not clearly but after many years of going over statements and, you know, in the reports, yes."  Defendant admitted that he had been drinking and that affected his ability to recall.  He also acknowledged telling Phyllis that he did not remember driving her truck or being transported to jail.  When asked about his statements to Herspring, defendant acknowledged he told Herspring that he did not go into the house.  At that time, he did not remember stepping inside, although he now recalled that he went inside

10.

the house.  When asked if he remembered accusing Phyllis of having an affair, defendant responded:

> "Well, that was after I laid down.  And -- and then in my sleep, in my sleep.  I -- it was a dream that she cheated on me.  And I snapped.  I got up.  And -- and I accused her, you know, [of] having an affair."

## B.      Phyllis's Testimony for Defense

Phyllis acknowledged that she had, in the past, hit defendant in the face, called him names, and hit him with a cane.  They had many arguments leading up to the incident due to his jealously, and she was tired of it, but defendant had not hit her before that morning.

# DISCUSSION

## I.      *The trial court did not abuse its discretion by excluding testimony from defendant's expert and denying defendant's resulting motion for mistrial.*

### A.      Background

#### 1.      Motions in Limine

##### a)      *April 16, 2018 Motions In Limine Hearing*

The prosecutor filed a supplemental motion in limine on April 16, 2018, to exclude defendant's expert witness, Dr. John Hamel, Ph.D., who was to testify regarding self-defense.  The prosecutor argued that the evidence did not show defendant was acting in self-defense and, therefore, the expert was not relevant unless defendant testified to facts showing he acted in self-defense.  The prosecutor further argued that the expert could not testify to any statements made by defendant as they would be hearsay.

The trial court addressed the parties' motions in limine that same day.  When asked by the trial court, defense counsel affirmed that he would be offering evidence of self-

defense, advising the court that the record contained evidence that Phyllis had struck defendant in the past. Counsel explained his theory of the defense:

> "[U]nder intimate partner battering, the self-defense takes -- occurs when the, in this case, [defendant], learns to recognize the escalating patterns of -- of abuse. And that would be *In [r]e Walker*,[2] Your Honor.

> "Additionally, there was -- that [morning] there was an argument which escalated the combination of those three things draws an inference that there is sufficient evidence to create reasonable doubt that the People need to overcome regarding [defendant] acting in self-defense."

Counsel advised the court that the expert would be interviewing defendant and relying upon statements in that interview for his testimony. The court ruled, "All right. At this time, the Court's not going to allow the expert to testify unless and until we have further hearings on the matter." Regarding the prosecutor's objections to the expert testifying as to defendant's statements, the court ruled, "And I tend to agree with you, that the statements that evidence has to come in in a form other than hearsay." The court scheduled a further hearing for April 20, 2018, but this was later moved to April 23, 2018.

### b)    April 23, 2018 Evidence Code Section 402 Hearing

Defendant filed a motion in limine to admit the testimony of his expert on intimate partner battering on April 23, 2018. At the hearing on that day, the court asked counsel to explain the relevance of intimate partner battering to defendant's case. Counsel explained that defendant had been battered for the last four years and Phyllis would provide testimony that she had battered defendant multiple times in the past, including an incident where defendant was required to seek medical treatment as a result. The discussion continued:

> "THE COURT: And how does that relate to the incident that's part of the charges in this case?

---

**2**    *In re Walker* (2007) 147 Cal.App.4th 533 (*In re Walker*).

12.

"[COUNSEL]:  In this matter, Your Honor, there was an argument that escalated preceding the incident.  Um, when reviewing *In [r]e Walker*, as I talked about at the last hearing on this, or when we discussed this last, it says, 'the admission of expert testimony is relevant to the claims of self-defense because such expert testimony can support a defendant's theory of justifiable homicide in true self-defense by enabling the jury to find the battered woman or man is particularly able to predict accurately the likely extent of violence in any attack.'  And so due to the --

"THE COURT:  Well --

"[COUNSEL]:  -- escalating argument that [morning] … our position is [defendant] was able to predict the attack that was forthcoming.

"THE COURT:  Okay.  So there was no attack, it was anticipated based upon his experience?

"[COUNSEL]:  Yes, Your Honor, but that's in -- that's in accordance with *In [r]e Walker* of the theory of this defense.

"THE COURT:  Doesn't self-defense require an actual act?

"[COUNSEL]:  Your Honor, um --

"THE COURT:  Anticipation of one?

"[COUNSEL]:  And this – and in this particular self-defense based on the -- excuse me, one moment, your Honor.

"Um, based on the supplemental instruction included with [CALCRIM No. ]3470, 'someone who has been threatened or harmed by a person in the past is justifiable in acting more quickly or taking greater self-defense measures against that person.' "

The prosecutor objected, arguing that defendant could not establish the facts of the incident that night by relying on past violence alone—defendant needed to testify that he believed he was in imminent danger when he used force that night.  The court asked whether defendant intended to testify, and counsel responded that it had not been decided.  The court asked counsel to explain how the defense would prove that defendant believed he was in imminent danger if he did not testify.  The court questioned whether the expert testimony and the past history of violence could establish defendant's state of mind for self-defense without his testimony, expressing concern that the jury would be speculating as to defendant's state of mind.

13.

To assist the court, defense counsel provided Dr. Hamel's report. According to the report, defendant remembered arguing with Phyllis while "in a 'dreamlike state' " under the influence of drugs and alcohol and admitted to punching her and pulling her hair. The report noted defendant made the following statements to a previous doctor who examined him: " 'Drugs and alcohol had an effect, but…holding it in…for four years. Physically abusing me, getting mad, cussing, hitting me in the chest, the side…Get pissed off.' " Dr. Hamel concluded that "[i]n the midst of an escalating argument rather than with premeditation, [defendant] 'snapped,' triggered by fears of once again being rejected or abused, physically and emotionally." After reviewing the report, the court granted the motion to exclude Dr. Hamel's testimony until defendant testified:

> "THE COURT: I've reviewed the forensic report provided by Dr. Hamel. Also read the investigative report. It appears to the Court there's still something missing and that is the state of mind of the defendant at the time. So at this point no one knows if he's going to testify. Unless and until we come to that point, the Court's not going to allow the expert to testify. There's no basis for it. He's just asking the jury to speculate as to what happened, why it happened. If the defense can provide me with a case where an expert testified and there was not testimony from the individual who was seeking the self-defense claim, I'd be happy to look at that. At this point, I'm not aware of any."

### 2. May 1, 2018 Expert Testimony Discussion

On May 1, 2018, prior to presenting defendant's case, counsel inquired regarding whether his expert would be permitted to testify. The court found that Dr. Hamel was qualified and the hearsay problem would be resolved if defendant testified.

### 3. Discussion After Defense Case on May 2, 2018

On May 2, 2018, defendant and Phyllis testified as part of defendant's case. During a bench conference following Phyllis's testimony, the prosecutor renewed his motion to exclude Dr. Hamel's testimony. Pointing out that defendant never testified that he believed he was in immediate danger when he hit Phyllis, the prosecutor argued that

14.

defendant could not rely on self-defense and the expert testimony was not relevant as it related only to self-defense. The jury was excused for a hearing on the issue.

The prosecutor argued that defendant failed to testify that he believed he needed to use self-defense and the facts did not establish that defendant was in imminent danger. Defense counsel argued that defendant's belief that Phyllis would be angry that he took her car, in combination with her past history of violence, was sufficient for self-defense where the expert could testify that a victim of abuse becomes sensitive to predicting physical attack. The court ruled:

> "There are certain things that have to be established before the expert would be allowed to testify. And the Court is inclined to agree with the People in this matter. I don't think there's been any testimony regarding self-defense by [ ] defendant or by [Phyllis]. The fact that someone was struck in the past during an argument, doesn't indicate anything regarding self-defense. [¶] … [B]ut there would seem to be more required before the expert can come in and opine that this was a matter of self-defense. [¶] So I'm going to deny the request to have the expert testimony. It's not relevant."

Attempting to change the ruling, defense counsel elaborated that the expert could explain that someone who has been abused is able to predict future violence by the abuser to demonstrate why defendant's actions were reasonable. The court responded, "The only evidence I've heard so far is that he came home. He got angry. He accused her doing things. He then begins to physically abuse her. I don't -- I haven't heard anything about self-defense." After the prosecutor's argument, the following discussion occurred:

> "THE COURT: … And correct me if I'm wrong, the testimony is things were calmed down. They're both laying down, and then he jumps up and starts attacking her. [¶] … [¶]
>
> "THE COURT: Okay. Well, she's laying down asleep presumably. He gets up and starts attacking her. You're arguing that that's self-defense?
>
> "[COUNSEL]: Yes, Your Honor. When -- you read…
>
> "THE COURT: He anticipated she was going to wake up any second and start hitting him?
>
> "[COUNSEL]: Possibly, Your Honor.

15.

"THE COURT:  Well --

"[COUNSEL]:  Based on --

"THE COURT:  -- certainly possible but that's not the evidence....

"[COUNSEL]:  But based on -- but based on the pattern that has occurred, it's probable.

"THE COURT:  I haven't heard any pattern about her waking up and attacking the defendant.

"[COUNSEL]:  No, but there's patterns of escalating arguing before the domestic violence occurred.

"THE COURT:  Escalating yes, but she was asleep.  They were both asleep.  [¶] … [¶]

"THE COURT:  All right.  I just don't see it.  It does not appear to the Court to be relevant."

### 4.     Defense Moves to Recall Defendant to Testify

After granting the prosecutor's motion to exclude Dr. Hamel's testimony, the court asked to review the jury instructions with counsel.  Before doing so, defense counsel asked for permission to recall defendant, advising that defendant "provided [counsel] a clearer picture of what occurred."  The court indicated that defendant had the opportunity to testify and it would not permit defense to reopen unless there was something new.  Counsel advised that the information was an elaboration of the events of June 26, 2015, though not anything new, and an attempt to establish a basis for the expert testimony based upon the court's ruling.  The court did not see a basis for reopening as "[defendant] had plenty of opportunity to do this."

### 5.     Jury Instruction Conference

Thereafter, the court expressed its intent not to instruct the jury on self-defense as no factual basis had been established.  The prosecutor requested the instruction because the jury had been asked about it during voir dire and otherwise the jury might speculate on whether self-defense was applicable.  Defense counsel submitted on the request to provide the self-defense instruction to the jury and the court agreed to include it in the final instructions.

### 6. Jury Instructions

After the instruction conference, the defense rested. The trial court instructed the jury that to prove defendant guilty of the crime of inflicting injury on his cohabitant that resulted in a traumatic condition, "the People must prove that, one, the defendant willfully and unlawfully inflicted a physical injury on his cohabitant. Two, the injury inflicted by the defendant resulted in a traumatic condition. And three, the defendant did not act in self-defense."

The jury was also instructed on self-defense pursuant to CALCRIM No. 3470. Defendant would not be guilty of the crime if he (1) "reasonably believed that he was in imminent danger of suffering bodily injury, or was in imminent danger of being touched unlawfully"; (2) "reasonably believed that the immediate use of force was necessary to defend against that danger"; and (3) "used no more force than was reasonably necessary to defend against that danger." The instruction cautioned that "[b]elief in future harm is not sufficient no matter how great or how likely the harm [was] believed to be," the belief must have been reasonable, defendant must have acted based on that belief, and the force must have been no more than a reasonable person would believe is necessary in the same situation.

In considering the reasonableness of defendant's belief and conduct, the jury was instructed to consider all circumstances known to defendant. If the jury found that Phyllis threatened or harmed defendant in the past, it could consider that information in deciding whether defendant's conduct and beliefs were reasonable and whether someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person.

### 7. Motion for Mistrial

Prior to closing arguments on May 3, 2018, defense counsel requested a mistrial based upon the court's exclusion of Dr. Hamel's expert testimony. The court denied the

motion, recognizing that it had repeatedly advised defendant that a foundation was needed and believed such a foundation would be laid when defendant testified:

> "[B]ut there was no testimony regarding the self-defense issue whatsoever. Other than in the past he had been battered by [Phyllis] in this matter. There is no testimony regarding the -- the incident itself being in any fear, any concern about being battered. The Court's recollection of the testimony was that they had some argument, some confrontation and that it all calmed down. They went to bed. The defendant woke up and immediately began to -- incite an incident again and to batter and cause traumatic injury to [Phyllis] in this matter."

The court denied the motion for mistrial, ruling that an expert could not testify as to defendant's state of mind unless there was evidence presented that defendant feared Phyllis would injure him.

### 8. Closing Argument

Defense counsel argued that defendant acted in self-defense. Counsel argued that Phyllis testified that she was attempting to calm defendant down but that her response to defendant's jealousy was to degrade, belittle, hit, and strike him with a cane. Counsel asked the jury to infer that Phyllis behaved the same way the night of the incident as well and that defendant "snapped" because he was tired of being belittled and hit and "said no more." Counsel argued that defendant knew Phyllis would be mad when he returned home, he knew that she hit him in the past when she was mad, and that defendant reasonably used force that night because she had used it against him in the past. Because Phyllis had struck defendant with a cane in the past, his striking her with a fist was reasonable by comparison with what he suffered previously.

Defense counsel argued that Phyllis's testimony that she was attempting to calm defendant was the equivalent of her responses during other arguments where she had struck him and, therefore, defendant must have believed she would hit him during this dispute. Because he had been harmed in the past, defendant was justified in acting quickly to defend himself.

**B.**     *No substantial evidence showed defendant acted in self-defense and, therefore, the trial court properly exercised its discretion to exclude defendant's expert testimony on intimate partner battering as irrelevant.*

Defendant argues that the trial court deprived him of his right to present a complete defense under the due process clause of the Fourteenth Amendment to the United States Constitution by excluding his proffered expert testimony as to intimate partner battering to support his claim of self-defense and, therefore, should have granted his motion for mistrial. As part of this argument, defendant claims that the trial court abused its discretion in denying his request to reopen his testimony to lay the necessary foundation for self-defense. The People respond that defendant failed to testify that he hit his girlfriend because he feared she would injure him and, therefore, the trial court properly found the proffered expert testimony to be irrelevant. Because defendant had an opportunity to, and did, testify, the trial court did not abuse its discretion in denying the request to recall defendant to the stand. We agree with the People.

### 1.     Law and Standard of Review

The trial court possesses wide discretion to admit or exclude expert testimony. (*People v. McDowell* (2009) 54 Cal.4th 395, 426.) We will not reverse the trial court's ruling on expert testimony unless we find a manifest abuse of discretion. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299.) The trial court abuses its discretion if it exercises it in an arbitrary, capricious, or patently absurd manner. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

"A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial." (*People v. Bolden* (2002) 29 Cal.4th 515, 555.) The basis for defendant's mistrial motion was the exclusion of his expert witness testimony and, therefore, our analysis is dependent upon whether the trial court abused its discretion in so ruling.

19.

### *a)     Intimate Partner Battering*

Evidence Code section 1107, subdivision (a) provides that intimate partner battering[3] and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, is admissible by either the prosecution or the defense.  The proponent must establish a foundation that such evidence is relevant and the expert witness has the proper qualifications.  (Evid. Code,§ 1107, subd. (b).)  "Accordingly, a properly qualified expert may testify to [intimate partner battering] when it is relevant to a contested issue at trial other than whether a criminal defendant committed charged acts of domestic violence." (*People v. Gadlin* (2000) 78 Cal.App.4th 587, 592.)[4]

"[Intimate partner battering] 'has been defined as "a series of common characteristics that appear in [individuals] who are abused physically and psychologically over an extended period of time by the dominant [partner] in their lives." ' " (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1083–1084 (*Humphrey*).)  Evidence of intimate partner battering is relevant to establish self-defense, i.e., that the defendant actually and reasonably believed in the need to defend against imminent harm.  (*Id*. at pp. 1082, 1086.)  In murder cases, it may also be relevant to establish "imperfect self-defense," i.e., that the defendant actually believed in the need to defend against imminent death or serious bodily injury, but the belief was objectively unreasonable.  (*Ibid.*; see *People v. Aris* (1989) 215 Cal.App.3d 1178, 1188 (*Aris*), disapproved on another ground in *Humphrey*, at p. 1089.)

---

[3]     Previously referred to as "battered women's syndrome," the preferred terminology is now "intimate partner battering."  (Evid. Code, § 1107, subd. (f); *People v. Wright* (2015) 242 Cal.App.4th 1461, 1492, fn. 11.)

[4]     We focus on the relevance issue, as there has been no challenge to the expert's qualifications and the trial court excluded the evidence based upon relevance.

### b) Self-defense

Defendant offered the expert testimony of intimate partner battering in support of his claim of self-defense. " 'A person claiming self-defense is required to "prove his own frame of mind," and in so doing is "entitled to corroborate his testimony that he was in fear for his life by proving the reasonableness of such fear." ' " (*People v. Minifie* (1996) 13 Cal.4th 1055, 1065 (*Minifie*).) " 'To justify an act of self-defense for [an assault charge under Penal Code section 245], the defendant must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him. [Citation.]' [Citation.] The threat of bodily injury must be imminent (*In re Christian S.* (1994) 7 Cal.4th 768, 783), and '… any right of self-defense is limited to the use of such force as is reasonable under the circumstances.' " (*Minifie*, at pp. 1064–1065.)

### 2. Analysis

For expert testimony on intimate partner battering to be relevant, the evidence must be sufficient to permit a jury to find that defendant honestly feared bodily injury from Phyllis when he used force against her. The trial court did not abuse its discretion in excluding the testimony given the lack of any evidence that defendant held such a belief or that any such threat of injury was imminent.

### a) Actual Belief in the Need to Defend Oneself

A jury will not be permitted to consider a defendant's claim of self-defense unless there is substantial evidence to support it. (*People v. Simon* (2016) 1 Cal.5th 98, 132 (*Simon*).) Substantial evidence is evidence sufficient to deserve consideration by a jury, that is, evidence that a reasonable jury would find persuasive as opposed to speculative, minimal, or insubstantial. (*Ibid.*) In *Simon*, the trial court declined to instruct the jury on "imperfect self-defense," described as a defendant's actual but unreasonable belief that he or she is in imminent danger.[5] (*Simon*, at p. 132.) *Simon* upheld the trial court's ruling,

---

[5] Perfect self-defense requires the actual and reasonable belief in the need to defend oneself. Imperfect self-defense is not actually a defense. Because imperfect self-defense

21.

agreeing there was a lack of substantial evidence of the defendant's " ' "honest belief" ' " for self-defense purposes. (*Id*. at p. 134.) *Simon* noted that there was no evidence that the victim was the aggressor, the defendant failed to present evidence that he perceived a threat from the victim, the defendant initiated the aggressive interactions, the victim was not armed, and the defendant never told anyone that he acted out of fear. (*Ibid*.) Based on the review of the evidence, *Simon* also opined that "[b]ecause we conclude there was not substantial evidence supporting [the defendant's] actual belief that he was in imminent danger of great bodily injury or death, the trial court would not have erred had it likewise refused to instruct on complete self-defense." (*Ibid*. ["Further, just because the court permitted instructions on perfect self-defense does not mean that substantial evidence supported [it] … it would not have been error for the trial court to have denied perfect self-defense instructions … because no substantial evidence supported such a defense."], citing with approval *People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1270.)[6]

The facts of *Simon* are remarkably similar to the facts of defendant's case. The trial evidence did not show that Phyllis ever engaged in aggressive conduct that morning, defendant never once expressed he had an actual fear of harm when attacking his girlfriend (Phyllis) in either his prior statements or his trial testimony, the evidence

---

reduces an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice; this form of voluntary manslaughter is considered a lesser and necessarily included offense of murder. (*Simon*, *supra*, 1 Cal.5th at p. 132.) However, since both legal principles require an actual belief in the need to defend, cases interpreting that element are instructive on perfect self-defense, which is at issue in this case. (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262 ["The subjective elements of self-defense and imperfect self-defense are identical. Under each theory, the [defendant] must actually believe in the need to defend himself against imminent peril to life or great bodily injury."].)

[6]    The trial court here did instruct on self-defense, even though it excluded testimony on intimate partner battering, because the prosecutor requested the instruction so that the jury would know self-defense was not applicable, given it was extensively discussed during voir dire. However, that fact does not affect our analysis given that in *Simon* the Supreme Court upheld the trial court's ruling not to instruct on imperfect self-defense while it instructed the jury on perfect self-defense. (*Simon*, *supra*, 1 Cal.5th at p. 134.)

showed that defendant initiated the aggressive interaction, and defendant never told anyone he acted out of fear.[7] (See *Simon*, *supra*, 1 Cal.5th at p. 134.)

When Phyllis described defendant's attack on her, she described defendant as angry and drunk. She never testified that she ever struck or threatened defendant after he arrived home that morning. In fact, she testified that she was able to calm defendant and they both went to bed. Phyllis had been sleeping until defendant woke and attacked her. During Phyllis's conversation with the 911 dispatcher, defendant can be heard yelling at the dispatcher, expressing anger and jealousy at what he believed to be a romantic partner of Phyllis's. Phyllis's testimony provides no evidence that defendant feared her or that he attacked her to protect himself.

Furthermore, defendant's claim of self-defense is undercut by evidence that he went out of the residence and threw planters at Phyllis's vehicle, breaking the windshield and side mirrors. This conduct results from anger and supports the evidence that defendant attacked Phyllis because he was angry at her and not because he feared harm from her.

Defendant's statements to Officer Herspring lend no support to a claim of self-defense. Defendant never claimed he attacked Phyllis to defend himself. He told Herspring that he broke the planters because Phyllis would not let him inside the house. He never mentioned that she had threatened or assaulted him and denied that he had entered the residence or assaulted her.

During three telephone conversations, defendant and Phyllis discussed the incident. Defendant never, during any of the three conversations, indicated that Phyllis had threatened to harm him, harmed him, or that he feared she would harm him that morning. Defendant never expressed any fear of Phyllis, nor did he attempt to justify his

---

**7**     According to Dr. Hamel's report, defendant did not claim he hit Phyllis because he was acting in self-defense or feared harm from Phyllis.

23.

actions as necessary to protect himself from her. Each time Phyllis told defendant that she had done nothing to deserve the beating, defendant agreed with her. He did not respond with any accusations indicating that Phyllis had been violent or threatening to him the morning he hit her.

During the calls, defendant claimed his conduct was out of character and blamed his actions on being drunk and angry. Defendant did not indicate that he was responding to any actions or threats by Phyllis. While defendant did discuss prior episodes where Phyllis had hit him, defendant did not justify his actions based upon how she treated him in the past. Rather, defendant emphasized that he had not reported her to the police and asked that she drop the current charges. He never indicated that her past episodes of violence had anything to do with his actions in striking her. Defendant blamed his conduct on his drug use and jealousy, and also claimed at times not to remember what had happened.

At trial, defendant testified the night before the incident he had taken Phyllis's truck from her driveway and used her bank card to obtain cash to buy marijuana and alcohol. While he expected she would be angry when he returned, defendant never testified that Phyllis ever expressed anger that morning. He testified that she had struck him during arguments in the past but did not testify she had struck him that morning or that he feared she would strike him. When asked if he had hit Phyllis, defendant responded, "Well, to this day I still don't believe it, but I did, you know." Defendant's response does not indicate that he feared injury from Phyllis, either based on the past incidents or anything that transpired that morning. When asked if he remembered expressing jealousy that morning, defendant explained his actions:

> "Well, that was after I laid down. And -- and then in my sleep, in my sleep, I -- it was a dream that she cheated on me. And I snapped. I got up. And -- and I accused her, you know, [of] having an affair."

24.

At no time did defendant indicate that Phyllis threatened or injured him, nor that he feared she would do so.

### b) *Fear of Imminent Harm*

"Moreover, for either perfect or imperfect self-defense, the fear must be of imminent harm. 'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury.' " (*Humphrey*, *supra*, 13 Cal.4th 1073 at p. 1082.) All the surrounding circumstances, including prior assaults and threats, may be considered in determining whether the accused perceived an imminent threat of death or great bodily injury. (*Id*. at p. 1083.) Evidence Code section 1107, permitting admission of expert testimony regarding intimate partner battering, does not modify the imminence requirement.[8]

Describing incidents where he had been slapped, hit, and, on one occasion, struck over the head and jabbed with a cane, defendant argues that this evidence was sufficient to show that he honestly and reasonably believed himself to be in imminent harm when he attacked Phyllis. While a history of threats and physical abuse might be relevant to *support* a defendant's honest belief that bodily injury was imminent, here there was no evidence to indicate that defendant subjectively believed that he was in imminent danger when he hit Phyllis. In fact, under questioning by the prosecutor, defendant attributed the attack to a dream in which he thought the victim was cheating on him and he "snapped." He never indicated that he feared the sleeping victim would escalate her response if he merely yelled at her. While defendant's testimony, as well as that of Phyllis established past abuse by Phyllis, it did not establish imminence, or that defendant believed harm was imminent.

---

[8]    Evidence Code section 1107, subdivision (d) provides: "This section is intended as a rule of evidence only and no substantive change affecting the Penal Code is intended."

Our Supreme Court has defined the "imminent harm" element of self-defense as follows: " ' "[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*" ' " (*In re Christian S.*, *supra*, 7 Cal.4th at p. 783.) Clearly, defendant could not reasonably believe he was required to defend himself with force in this scenario. Rather, the evidence overwhelmingly suggests that defendant was simply enraged.

In support of his argument that the evidence was sufficient to make the expert's testimony relevant, defendant cites to cases where the evidence showed that the defendants actually believed harm was imminent even though a reasonable person would not have believed it. (See *In re Walker*, *supra*, 147 Cal.App.4th at pp. 539–540, 552, 554 ["even though Walker testified the gun fired accidentally, she also testified that, because of prior beatings by her husband and his threat to kill her earlier that day, she feared for her life when he reentered their home on the evening of May 13, 1990"]; *Humphrey*, *supra*, 13 Cal.4th at pp. 1078–1080 [the defendant testified that the victim threatened to kill her the day before and fired a gun at her, and the defendant shot the victim believing that he was reaching for a gun and intended to harm her].) These cases are unhelpful to defendant because the evidence here does not demonstrate that he actually feared imminent harm to himself or others from Phyllis.

We therefore conclude that the trial court did not abuse its discretion in excluding expert testimony of intimate partner battering. The testimony would only have been relevant to self-defense and, as we have shown, that defense was not supported by the evidence and the trial court was not legally required to instruct on the defense under the facts of this case.

Our analysis of the imminence requirement is further supported by *Aris*, *supra*, 215 Cal.App.3d at p. 1192. *Aris* upheld the trial court's refusal to instruct on perfect self-defense, holding that no reasonable jury could have concluded that "a sleeping victim

26.

presents an imminent danger of great bodily harm, especially when the defendant was able to, and actually did, leave the bedroom, and subsequently returned to shoot him." (*Id*. at p. 1192, disapproved on other grounds in *Humphrey*, *supra*, 13 Cal.4th at pp. 1088–1089.)[9]

Defendant argues that he was not required to testify that he acted in self-defense, citing *People v. Barton* (1995) 12 Cal.4th 186. Defendant is correct that a jury should be permitted to determine whether a defendant acted in self-defense even where the defense might conflict with the defendant's own testimony or where the defendant does not testify. However, this principle only applies where the record contains substantial evidence to support self-defense regardless of the defendant's testimony. (See *id*., at pp. 202–203 [finding sufficient evidence of intentional shooting in imperfect self-defense despite the defendant's assertion that the shooting was accidental]; *In re Walker*, *supra*, 147 Cal.App.4th at pp. 539–540, 554 [evidence from the defendant that the gun fired accidentally and that, because of prior beatings by her husband and his threat to kill her earlier that day, showed she feared for her life].)

In *Barton* and *In re Walker*, the defendants claimed that the shootings were accidental. Each involved a factual scenario where there was substantial evidence in support of self-defense, irrespective of the defendants' testimony. Both of those defendants were involved in altercations with the victims and the evidence established factual circumstances that could support either accidental or intentional harm to the victims while the defendants were defending themselves. Thus, the juries could reject the defendants' testimony that they fired their weapons accidentally, but still find that they intentionally fired the guns in lawful self-defense. However, in this case, Phyllis was

---

[9]     *Aris* also held that evidence of intimate partner battering was not relevant to the objective reasonableness of the defendant's perceived need to defend. (*Aris*, *supra*, 215 Cal.App.3d at p. 1192.) *Humphrey* disapproved *Aris* only to the extent it conflicted with its conclusion that evidence of intimate partner battering is generally relevant to the reasonableness as well as the subjective belief in the need for self-defense. (*Humphrey*, *supra*, 13 Cal.4th at pp. 1088–1089.)

sleeping and there is no evidence that she either threatened to, or harmed, defendant. Even if the jury discredited defendant's testimony that he harmed the victim intentionally, there is no substantial evidence that defendant acted in self-defense that morning.

Defendant offered expert testimony that, as a battered person, he could predict the extent of violence from Phyllis that would likely occur if she was angry with him when he returned home and if they fought. But the evidence did not permit an inference that Phyllis was angry and fought with defendant at the time she was attacked, or that defendant could reasonably fear she would harm him because she was asleep. Under the circumstances of the present case, it would have been sheer speculation for jurors to assume that, even though there was no evidence defendant feared imminent harm from Phyllis that morning, that she likely would be violent with defendant and defendant likely would have feared she would cause him harm solely because Phyllis had been violent with defendant in the past. " '[S]peculation is not evidence, less still substantial evidence.' " (*People v. Dennis* (1998) 17 Cal.4th 468, 508; see also *People v. Babbitt* (1988) 45 Cal.3d 660, 682 [" 'The inference which [the] defendant sought to have drawn from the [proffered evidence] is clearly speculative, and evidence which produces only *speculative* inferences is *irrelevant* evidence.' " (First bracketed insertion added.)].) Where, as here, there is no evidence showing that Phyllis posed a threat to defendant, expert testimony only invites speculative rather than reasonable inferences as to defendant's state of mind. Thus, it cannot be said to have a tendency in reason to prove a disputed material fact. (Evid. Code, § 210.)

In summation, to prove his or her own frame of mind to argue self-defense, a defendant is entitled to corroborate testimony that he or she feared the infliction of imminent bodily injury by proving the reasonableness of such fear (*Minifie*, *supra*, 13 Cal.4th at p. 1065) and likewise offer contextual evidence in the form of expert testimony to help the jury understand the situation from his or her perspective

(*Humphrey*, *supra*, 13 Cal.4th at p. 1086). But without direct or circumstantial evidence suggesting the defendant was subjectively in fear at the time he attacked Phyllis, corroborating testimony lacks foundation and cannot be admitted on its own to prove that ultimate fact. The proffered expert testimony in this case supported only a speculative inference that defendant might have feared harm from Phyllis. Absent some evidence that defendant was subjectively fearful of such an attack or that such an attack was imminent, evidence relevant only to the reasonableness of such fear was inadmissible to support a theory of self-defense. The trial court did not abuse its discretion in excluding the expert testimony.

### c) Expert Testimony as Relevant to Defendant's Credibility

Intimate partner battering expert testimony also may be relevant to the issue of a defendant's credibility to explain why a victim may have been abused but not have reported it, why a victim may not have left the abuser, or why the victim may have denied the abuse occurred. (See *Humphrey*, *supra*, 13 Cal.4th at p. 1087.) Defendant argues that expert testimony was relevant to his credibility, although he never offered the expert testimony for this purpose in the trial court. "To preserve an alleged error for appeal, an offer of proof must inform the trial court of the 'purpose, and relevance of the excluded evidence ….' (Evid. Code, § 354, subd. (a).) This is in accord with 'the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court *on the ground sought to be urged on appeal*.' " (*People v. Hill* (1992) 3 Cal.4th 959, 989, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; see *People v. Marks* (2003) 31 Cal.4th 197, 228.)

In any event, in cases where expert testimony on intimate partner battering is admitted in support of a defendant's credibility, the defendants have testified that they feared the victim would injure them. Intimate partner battering evidence speaks directly

to both recantation and reunion by a domestic abuse victim, especially where such actions are used to attack his or her credibility: "[Intimate partner battering] evidence was also relevant to defendant's credibility. It 'would have assisted the jury in objectively analyzing [defendant's] claim of self-defense by dispelling many of the commonly held misconceptions about battered [partners].' " (*Humphrey*, *supra*, 13 Cal.4th at p. 1087, first & third bracketed insertions added.) Because there is no evidence that defendant acted in self-defense, the jury did not need an explanation as to why defendant continued his relationship with the victim despite the physical altercations. We find that the proffered expert testimony would not have been relevant as to defendant's credibility.

### 3. Harmless Error

Even if the trial court erred in excluding Dr. Hamel's testimony that defendant was a battered partner and how that affected defendant's perception of danger at the time he hit Phyllis, defendant was not prejudiced due to the particular circumstances of this case.

Intimate partner battering is relevant to show that defendant genuinely believed he was in imminent danger of bodily injury. (See *Aris*, *supra*, 215 Cal.App.3d at p. 1199.) However, where both the victim and the defendant's own testimony established conclusively that neither the victim nor their behavior indicated an imminent danger as that term is defined by California law, it not reasonably probable that the expert's testimony would have convinced the jury that, nevertheless, the defendant honestly perceived an imminent danger resulting in a different verdict. (*Id*. at pp. 1199–1200.)

In *Aris*, the defendant left the room while the victim was asleep, returned to the room, thought it over, and then shot the victim while he was still sleeping. "No matter what the expert testimony, it is not reasonably probable that a jury would find [the] defendant actually believed she was in *imminent* danger." (*Aris*, *supra*, 215 Cal.App.3d at p. 1200.) As in *Aris*, defendant attacked his sleeping girlfriend. In addition, defendant never testified that he feared any attack from Phyllis when he woke and hit her. To the contrary, defendant testified that he dreamed Phyllis had been cheating on him and he

30.

snapped. We find that a different verdict was not reasonably probable even if the excluded testimony had been admitted. (See Evid. Code, § 354; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

### C. *The trial court did not abuse its discretion by denying defendant's motion to recall himself to supplement his testimony.*

After the court granted the prosecutor's motion to exclude Dr. Hamel's testimony and addressed jury instructions, outside the presence of the jury defense counsel asked for permission to recall defendant, advising that defendant "provided [counsel] a clearer picture of what occurred that evening." The trial court denied the request, characterizing it as a motion to reopen. However, defendant had not yet rested his case and did so only after trial reconvened in the presence of the jury. Thus, while the parties characterize this as a motion to reopen, we find it more properly analyzed as a motion to recall a witness. In either case, the court's denial of defendant's motion to recall himself is reviewed under the abuse of discretion standard. (*People v. Tafoya* (2007) 42 Cal.4th 147, 175–176.) The trial court's determination will be upheld unless it falls outside the bounds of reason. (*People v. Osband* (1996) 13 Cal.4th 622, 666.) We find no abuse of discretion here.

"A witness once examined cannot be reexamined as to the same matter without leave of the court, but he may be reexamined as to any new matter upon which he has been examined by another party to the action. Leave may be granted or withheld in the court's discretion." (Evid. Code, § 774.)

When defense counsel moved to recall defendant as a witness, the trial court indicated that it would permit it if there was something "new." Counsel advised that the information was "further elaboration on the June 26th incident," and an attempt to establish a basis for the expert testimony based upon the court's ruling. The court did not see a basis for reopening as "[defendant] had plenty of opportunity to do this."

Almost monthly, September 2016 to March 2018, defense counsel requested continuances of either the trial setting or the trial, advising the court that additional time

31.

was needed for investigation and consultation with an expert. The trial court also discussed the foundation needed to admit the expert testimony on April 16, April 23, May 1, and May 2, 2018. The record reflects that defendant had a fair opportunity to testify. There were no limitations. Defendant testified that he woke up believing Phyllis had cheated on him, snapped, and attacked her.

Given the record, we cannot find that the trial court's denial of defendant's motion to recall himself to elaborate on his testimony was an abuse of discretion.

### D. Defendant's claim of ineffective assistance of counsel cannot be reviewed on this record.

Defendant argues that his trial counsel was ineffective in failing to elicit from him the testimony needed to lay the foundation for his expert, prejudicing him by leaving him without a defense. We conclude that the record is not sufficient to permit us to evaluate this claim.

"In order to establish a claim for ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient and that the defendant suffered prejudice as a result of such deficient performance." (*People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*), citing *Strickland v. Washington* (1984) 466 U.S. 668, 687–692.) "To demonstrate deficient performance, defendant bears the burden of showing that counsel's performance ' " ' "fell below an objective standard of reasonableness … under prevailing professional norms." ' " ' [Citation.] To demonstrate prejudice, defendant bears the burden of showing a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*Mickel*, at p. 198.)

"[C]ertain practical constraints make it more difficult to address ineffective assistance claims on direct appeal rather than in the context of a habeas corpus proceeding." (*Mickel*, *supra*, 2 Cal.5th at p. 198.) "The record on appeal may not explain why counsel chose to act as he or she did. Under those circumstances, a

reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable." (*Ibid.*) "Moreover, we begin with the presumption that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.' [Citation.] Accordingly, [the California Supreme Court] ha[s] characterized defendant's burden as 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ' " 'no rational tactical purpose' " ' for an action or omission." (*Ibid.*)

Defendant's claims of prejudice and ineffective assistance both rely on a single premise—that defendant hit his girlfriend in self-defense. Absent any affirmative evidence that defendant did actually fear imminent harm from his girlfriend, we cannot conclude that counsel was ineffective in failing to elicit such testimony. The record before us does not reveal why defense counsel failed to ask defendant if he feared harm from Phyllis or why he hit her. On this record, it is possible that defendant did not remember what he did because he was drunk or, did in fact, hit Phyllis because he was angry, drunk, and jealous and not in defense of himself. If true, counsel would have had strategic reasons for not directly asking defendant if he feared Phyllis would imminently harm him.

Absent any affirmative evidence that there was no rational tactical purpose for counsel's forbearance, "it would be inappropriate for us to address defendant's ineffectiveness claim on direct appeal." (*Mickel*, *supra*, 2 Cal.5th at p. 200.)

## II. *The trial court correctly instructed the jury regarding consciousness of guilt and was not required to sua sponte instruct on voluntary intoxication.*

### A. Background

The court conducted a jury instruction conference on May 2, 2018. During the conference, the prosecutor requested the jury be instructed with CALCRIM No. 362,

"Consciousness of Guilt: False Statements." The court indicated that it intended to so instruct based upon statements defendant made to Officer Herspring before defendant was arrested in which he denied entering the house and injuring Phyllis.

When asked if the defense objected, defense counsel responded, "Yes, Your Honor. I -- my only argument would be that as he -- I mean -- no, Your Honor." At the conclusion of the conference, the court asked, "[A]ny instructions the Court's giving that defense objects to?" Defense counsel responded, "No, Your Honor." The court then asked, "[A]ny instructions you've requested that the Court's not going to -- the Court's indicated it's not giving that you'd like to be heard on?" Defense counsel responded, "No, Your Honor."

The court instructed the jury as follows:

> "If the defendant made a false or misleading statement before his trial -- I'm sorry, before this trial, relating to the charged crime, knowing the statement was false or intending to mislead that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, the evidence that the defendant made such a statement cannot prove guilt by itself."

During closing argument, defense counsel explained defendant's statements to Officer Herspring:

> "And then they said that [defendant] lied to the cop that night. Officer woke [defendant] up, he was drunk. Wasn't sure what was going on and denied it. And then he testified in court. He told you what happened that night."

### B.     Standard of Review

Defendant did not object to instructing the jury with CALCRIM No. 362, nor request that the instruction be clarified with reference to the effect of voluntary intoxication on whether defendant knew his statement was false or misleading. Generally, the burden of requesting supplemental or clarifying instructions falls on the defendant, and he or she may not "complain on appeal that an instruction correct in law

34.

and responsive to the evidence was too general or incomplete." (*People v. Lang* (1989) 49 Cal.3d 991, 1024.) However, this court may review an instructional error if it affects defendant's substantial rights. (§ 1259; See *People v. Gamache* (2010) 48 Cal.4th 347, 375.)

### C. Analysis

#### 1. *The evidence supported instructing the jury with CALCRIM No. 362.*

Defendant argues that the court should not have instructed with CALCRIM No. 362 because he was too intoxicated to have intended to deceive when he made the statements and, therefore, the evidence failed to support an inference that the false statements were evidence of his awareness of his own guilt. We reject this argument.

" 'It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference. [Citation.] Whether or not any given set of facts may constitute suppression or attempted suppression of evidence from which a trier of fact can infer a consciousness of guilt on the part of a defendant is a question of law. Thus in order for a jury to be instructed that it can infer a consciousness of guilt from [a defendant's false statements], there must be some evidence in the record which, if believed by the jury, will sufficiently support the suggested inference.' " (*People v. Hart* (1999) 20 Cal.4th 546, 620.) "Permissive inferences are therefore constitutionally suspect when, 'under the facts of the case, there is no rational way the trier could make the connection permitted by the inference.' " (*People v. Gomez* (2018) 6 Cal.5th 243, 290.)

An instruction on consciousness of guilt is properly given when there exists evidence that a defendant made a deliberately misleading or false statement to explain his or her conduct. (*People v. Russell* (2010) 50 Cal.4th 1228, 1254; *People v. Page* (2008) 44 Cal.4th 1, 50–51.) Here, defendant told Officer Herspring that he did not enter the

house or hit Phyllis. However, defendant's voice can be heard on the recording of the 911 call that Phyllis made from her bedroom, and she also testified that defendant had entered the home, went to bed, and then awoke and assaulted her. " 'The jury could rationally infer that defendant made a false statement to deflect suspicion from himself.' " (*Russell*, at p. 1255.)

Evidence of defendant's intoxication during the incident and statements to Herspring were introduced at trial. Due to his intoxication, defendant may not have remembered being in the house and hitting Phyllis and, therefore, he did not know his statements were false. If his intoxication prevented him from knowing the statements were false or making them to deceive, the statements could not support an inference that he was conscious of his own guilt. But we reject the argument that the evidence of intoxication was sufficient as a matter of law to dispel the inference of guilt caused by the falsity of defendant's statements. Defendant was able to remember how much he drank. He remembered that he was responsible for breaking the planters and pots and told Herspring he had done so. However, defendant denied being inside the residence or hitting Phyllis. Because both incidents occurred close in time to each other, a jury could infer that if defendant remembered his actions outside the residence, he should have also remembered his actions inside the residence. On these facts, a jury could reasonably believe that defendant intentionally denied committing the serious felony of inflicting injury on Phyllis while admitting to the lesser crime of vandalism, supporting an inference that defendant was aware of his guilt.

CALCRIM No. 362 limits the reach of any adverse inference both by telling the jury that it decides the "meaning and importance" of the statements and by telling the jury the making of a willfully false statement "cannot prove guilt by itself." (CALCRIM No. 362.) Furthermore, CALCRIM No. 362 is designed to benefit the defense, " 'admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 908.)

36.

A jury would understand that consciousness of guilt was not the equivalent of a confession and that the false statements themselves were not sufficient to prove defendant guilty of the charged crimes. "The trial court properly left it for the jury to determine whether defendant's statement[s] to police [were] false or deliberately misleading, and if so, what weight should be given to that evidence." (*People v. McGowan* (2008) 160 Cal.App.4th 1099, 1104.)

We find the evidence supported instructing the jury with CALCRIM. No. 362 and supported an inference of consciousness of guilt despite evidence that defendant was intoxicated. The trial court did not err in instructing the jury with CALCRIM. No. 362.

### 2. *The trial court did not err in failing to instruct on voluntary intoxication.*

Defendant argues that the trial court erred in failing to instruct the jury that voluntary intoxication could negate the intent to deceive when making statements to the officer. While defendant did not request such an instruction, he argues that the trial court was required to instruct on voluntary intoxication sua sponte. We reject this contention.

In a criminal case, a trial court must instruct on general principles of law relevant to the issues raised by the evidence, even absent a request for such instruction from the parties. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) This includes the duty to give instructions relating a recognized defense to elements of a charged offense. (*People v. Saille* (1991) 54 Cal.3d 1103, 1117.) However, a defendant is not presenting a special defense and invoking sua sponte instructional duties when offering evidence to attempt to negate or rebut the prosecution's proof of an element of the offense. (*People v. Anderson* (2011) 51 Cal.4th 989, 996.) In such a case, a court has a duty to provide a " 'pinpoint' " instruction relating such evidence to the elements of the offense, but only upon request and not sua sponte. (*Id*. at pp. 996–997.)

Defendant's argument is based upon cases addressing intoxication as an aspect of diminished capacity. Intoxication, as it relates to diminished capacity, is relevant only to

37.

whether the defendant actually had the requisite specific mental state to commit a crime and is more akin to a pinpoint instruction to which a defendant is entitled upon request. (*People v. Saille*, *supra*, 54 Cal.3d at p. 1120.) Where a defendant attempts to relate his evidence of intoxication to an element of the crime, he or she may request a pinpoint instruction. (*Ibid.*) Because such an instruction does not involve a " 'general principle of law,' " a trial court does not err in failing to instruct on intoxication sua sponte. (*Ibid.*)[10]

However, in this case, intoxication was neither a defense nor related to any element of the crimes charged. In his closing argument, defense counsel argued that the evidence of voluntary intoxication precluded defendant from knowing that his statements to police were false and, therefore, did not evidence defendant's awareness of guilt. The jury instruction relating to consciousness of guilt limits the adverse inference from defendant's false statements both by telling the jury that it decides the "meaning and importance" of the statements and by telling the jury the making of a willfully false statement "cannot prove guilt by itself." (CALCRIM No. 362.) If a trial court has no duty to instruct sua sponte on voluntary intoxication as it relates to an element of the offense, we cannot impose such a duty where the instruction is unrelated to an element of the offense and related only to evidence that by itself cannot be used to prove guilt.

Defendant's reliance on *People v. Wiidanen* (2011) 201 Cal.App.4th 526 is misplaced. In *Wiidanen*, the defendant had made false statements to the police and the trial court instructed the jury that they could consider those false statements, if the

---

[10]     Several cases cited by defendant are inapposite as those defendants had requested the jury instruction relating to voluntary intoxication and, therefore, the appellate courts did not address whether the trial courts had a sua sponte duty to instruct the juries. (See *People v. Mendoza* (1998) 18 Cal.4th 1114, 1121–1122, 1131–1135 [addressing whether evidence of voluntary intoxication was relevant to intent required for aiding and abetting and remanding for determination of whether jury instructions were correct]; *People v. Reyes* (1997) 52 Cal.App.4th 975, 981, 985 [expert testimony regarding intoxication and the defendant's mental disorders admissible to negate the defendant's knowledge, an element of the crime of receiving stolen property], disagreed with by *People v. Berg* (2018) 23 Cal.App.5th 959, 969.)

defendant made them intentionally, to infer that the defendant was aware of his own guilt. (*Id*. at p. 533.) *Wiidanen* acknowledged that if the jury believed the defendant was too intoxicated to know his statements were false or misleading, then the jury could reject the inference that defendant was aware of his own guilt. (*Ibid*.) However, the trial court had instructed that the jury could only consider the defendant's voluntary intoxication in deciding whether he knew the victim was unconscious when the crime occurred (CALCRIM No. 3426) and thus erroneously prohibited the jury from considering defendant's voluntary intoxication in assessing whether he intentionally made false statements evidencing a consciousness of guilt. (*Wiidanen*, at p. 533.) "[A] trial court has no sua sponte duty to instruct on the relevance of intoxication, but if it does instruct, as the court here did, it has to do so correctly." (*People v. Mendoza*, *supra*, 18 Cal.4th at p. 1134.) *Wiidanen* held the trial court had erred because the instruction prohibited the jury from considering the defendant's intoxication in determining whether his false statements were probative of his consciousness of guilt. (*Wiidanen*, at p. 533.)

In this case, the trial court did not instruct the jury that it could not consider defendant's voluntary intoxication in assessing whether his statements evidenced a consciousness of guilt. Therefore, the jury in this case was not precluded by a court instruction from considering defendant's intoxication in determining whether defendant's false statements evidenced a consciousness of guilt. In fact, defense counsel even argued to the jury in closing that defendant's false statements to Herspring should not be used to infer that defendant felt guilty because defendant's intoxication prevented him from intentionally making the false statements to deceive Herspring. Defendant has failed to identify any case holding that the trial court had a sua sponte duty to instruct on voluntary intoxication solely where offered to rebut the inference described in CALCRIM No. 362 and not needed to correct another voluntary intoxication instruction. We conclude that this is not a "general principle of law" requiring a sua sponte instruction, and we find the trial court did not err in its instructions to the jury.

### 3. Harmless Error

Even if the trial court erred in giving CALCRIM No. 362, we nonetheless cannot conclude that the error was prejudicial. Defendant testified at trial that he attacked Phyllis after awaking from a dream and while she was asleep. He spoke with Phyllis during phone conversations, acknowledging that he had hit her. Phyllis testified that defendant hit her, and the 911 call corroborates that defendant was present and angry with her. When arrested, defendant was outside the residence and admitted to having vandalized her vehicle and planters. In short, the other evidence connecting him to those offenses was overwhelming even if the jury could not consider his denial of the crime to demonstrate consciousness of guilt. Therefore, we conclude that there is no reasonable probability of a different verdict had the instruction not been given. The impact of an inference of consciousness of guilt could not have resulted in a miscarriage of justice. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

### III. The trial court did not abuse its discretion by denying defendant's invitation to strike his prior serious felony convictions.

Defendant argues that the trial court abused its discretion in denying his invitation to strike his prior convictions pursuant to section 1385 and *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 504 (*Romero*).[11] We reject defendant's argument as the trial court acted within its discretion when it struck only two of the six prior strike convictions.

#### A. Background

As to count 1, the amended information alleged six prior "strike" convictions within the meaning of the Three Strikes law. In March 1983, defendant was convicted in

---

[11] A defendant's request for this type of leniency is commonly referred to as a "*Romero* motion," although defendants do not actually have a right to make motions under section 1385, subdivision (a). (*People v. Carmony* (2004) 33 Cal.4th 367, 375, 379 (*Carmony*).) Defendant thus captioned his request as an "INVITATION TO STRIKE" and we will use defendant's designation.

Los Angeles County Superior Court case No. A624419 of rape (former § 261.2), forced oral copulation (former § 288a, subd. (c)), and kidnapping (former § 207). Five years later, in March 1988, defendant was convicted in Los Angeles County Superior Court case No. A44793 of rape (former § 261.2), lewd and lascivious acts upon a minor (§ 288, former subd. (b)), and sexual penetration of a minor (former § 289).

After the jury convicted defendant in this case on May 3, 2018, defendant waived his right to a jury trial regarding his prior serious felony convictions, and the court subsequently found them to be true.

Defendant filed his "INVITATION TO STRIKE PRIOR SERIOUS FELONY CONVICTION[S]" on August 17, 2018. Defendant argued that (1) at his age, a 25-year-to-life sentence was effectively a life sentence; (2) the instant offense is neither a violent nor serious felony; (3) the instant offense is not similar to his earlier offenses; (4) his victim also supported a lower sentence; (5) if given a lower sentence, he would be paroled at an age where he would be less likely to reoffend; (6) his strike convictions occurred 30 and 35 years earlier; (7) substance abuse was involved in the instant offense; (8) his two strike convictions were close in time, obtained while in his early twenties and during a short period of time in his life; (9) the short lapse in time between the two strike cases would permit the court to consolidate them; and (10) in mitigation, he had been abused by the victim and was himself a victim of intimate partner battering.

The prosecutor opposed defendant's invitation to strike his prior convictions on September 10, 2018. In arguing defendant was a danger to the public, the prosecutor reviewed the underlying facts of defendant's prior convictions from his 1983 and 1987 cases. In the 1983 case, defendant was sentenced to eight years in prison for rape, forced oral copulation, and kidnapping. The victim in that case was riding her bicycle when defendant approached her and eventually knocked her from her bike, grabbed her, and forced her to an area between two houses. He tore off her pants and panties and told her

41.

that he intended to kill her when he was done. Defendant attempted to insert his penis into her anus, forced his penis into her mouth, and then raped her.

In November 1987, while on parole, defendant abused his six-year-old daughter. While his daughter was at her grandmother's house, defendant got into bed with her, disrobed them both, and inserted his fingers and penis into her vagina. Other family members came into the room and stopped defendant. Defendant received a 27-year prison term.[12] He was paroled in 2004 and discharged from parole in September 2007.

The probation officer's presentence report contained defendant's explanation of the instant offense:

> "Everything in my life just went loose. I was hitting rock bottom when that happened. It got to a boiling point when I snapped. I assaulted my girl and destroyed our property."

At the time of defendant's interview with the probation officer, defendant had not been employed since 2013, when he was laid off from his machinist job. Defendant admitted that he drank six to 18 beers once a week. While he tried to attend AA meetings, he was unable to stay sober enough to continue. Defendant also admitted that he used methamphetamine, oxycontin, marijuana, or PCP at least twice a week. While in custody, defendant attended a drug treatment program. He expressed remorse for his actions and acknowledged he would need to pay for his crime. The presentence report set forth defendant's criminal history, including a description of the strike convictions as well as convictions in 1980 and 1981 for misdemeanor vandalism and felony grand theft, and a 2014 conviction for public intoxication.

The trial court conducted a hearing on defendant's invitation prior to sentencing on September 14, 2018. Phyllis testified she first met defendant when he was getting out

---

[12] Prison records indicate defendant was originally paroled in June 1987, returned to prison in July 1987, and then paroled again in September 1987.

of the state hospital.[13]  Defendant received certifications for welding and forklift driving upon his release.  He also attended counseling meetings for substance abuse.  Phyllis believed defendant to be a good person who had spent enough time in custody for this crime.  She wanted to resume her relationship with him.  Phyllis further testified that they did not have an abusive relationship and he had only hit her once.

After hearing argument, the trial court discussed its familiarity with the facts of the case and its review of the record.  In explaining why defendant did not fall outside the spirit of the Three Strikes law, the trial court stated:

> "Basically, the nature of all -- all of these strikes and the current offense is violence, and it's violence focused on women.  The earlier case was a horrendous case of violence against a young woman.  The second case was a horrendous case against [ ] defendant's own daughter.

> "This case involves someone with whom [defendant] had a romantic relationship with and it was ongoing for some time.  And just the violence that was involved in all three of these instances cause the Court to believe that it does not fall outside of the Spirit of the Three Strikes [law]."

The trial court did strike the conviction for lewd and lascivious acts upon a minor (§ 288, former subd. (b)) and the conviction for sexual penetration of a minor (former § 289) after finding that these two counts arose from the same criminal act as the rape conviction (former § 261.2) charged in the 1988 case.  (See *People v. Vargas* (2014) 59 Cal.4th 635, 648 [holding a trial court abuses its discretion in failing to strike a prior conviction when multiple convictions arise out of a single act by the defendant as distinguished from multiple acts committed in an indivisible course of conduct].)

## B.  Law and Analysis

Section 1385 grants trial courts discretion to dismiss a prior strike conviction if the dismissal is in furtherance of justice.  (§ 1385, subd. (a); *Romero*, *supra*, 13 Cal.4th at

---

[13]  The record contains no information regarding defendant's placement in a state hospital, nor when that occurred.  Phyllis previously testified that she had first met defendant four years prior to the instant offense.

pp. 504, 529–530.) " 'A court's discretion to strike [or vacate] prior felony conviction allegations [or findings] in furtherance of justice is limited. Its exercise must proceed in strict compliance with … section 1385[, subdivision ](a) ….' " (*People v. Williams* (1998) 17 Cal.4th 148, 158 (*Williams*).) The Three Strikes law "was intended to restrict courts' discretion in sentencing repeat offenders." (*Romero*, at p. 528; accord, *People v. Garcia* (1999) 20 Cal.4th 490, 501 ["a primary purpose of the Three Strikes law was to restrict judicial discretion"].) The Three Strikes law establishes " 'a sentencing requirement to be applied in every case where the defendant has at least one qualifying strike' " unless the sentencing court finds a reason for making an exception to this rule. (*Carmony*, *supra*, 33 Cal.4th at p. 377.) There are "stringent standards that sentencing courts must follow in order to find such an exception." (*Ibid.*) In order to dismiss a prior strike conviction, "the court in question must consider whether, in light of the nature and circumstances of [the defendant's] present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams*, at p. 161.)

A trial court's decision not to dismiss a prior strike conviction is reviewed under the deferential abuse of discretion standard. (*Carmony*, *supra*, 33 Cal.4th at p. 374.) The Three Strikes law establishes that not striking a prior strike conviction is the norm, and there is a "strong presumption that any sentence that conforms to the[ ] sentencing norm[ ] is both rational and proper." (*Carmony*, at p. 378.) An abuse of discretion is established by demonstrating that the trial court's decision was "irrational or arbitrary. It is not enough to show that reasonable people might disagree about whether to strike one or more of his prior convictions." (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.) "Where the record is silent [citation] or '[w]here the record demonstrates that the trial court balanced the relevant factors and reached an impartial decision in conformity with

44.

the spirit of the law,' " we are required to affirm the trial court's ruling, " 'even if we might have ruled differently in the first instance.' " (*Carmony*, at p. 374, first bracketed insertion added.)

Defendant requested that the trial court exercise its discretion to strike the prior conviction allegations. At sentencing, the trial court stated that it had reviewed the motions, papers, documents, and submittals and listened to preliminary hearing and trial testimony. The trial court found that defendant did not fall outside the spirit of the Three Strikes law as he committed "horrendous" acts of violence on a woman he did not know and, five years later, on his own young daughter. In the instant case, defendant visited violence on someone with whom he shared a romantic relationship.

We conclude that defendant has failed to establish that the trial court's denial of the invitation to strike his prior convictions was outside the bounds of reason under the facts and the law. We may not find an abuse of discretion unless the decision was so irrational or arbitrary that no reasonable person could agree with it. And here, it was not. The trial court considered relevant factors and acted to achieve legitimate sentencing objectives. As the presentence report notes, defendant was convicted in five separate criminal cases, had been unemployed for at least two years before the instant offense, and had been abusing drugs twice a week and alcohol once a week.

Defendant argues that the trial court relied primarily, if not entirely, upon the nature of the prior strike convictions themselves. The trial court's stated reasons, which may not have encompassed all of its legal reasoning, refer to both defendant's prior strike convictions as well as the instant offense. The trial court was required to weigh the nature and circumstances of defendant's instant offense and his prior violent felony convictions, and the particulars of his background, character, and prospects. (*Williams*, *supra*, 17 Cal.4th at p. 161.) This information was included in the materials the trial court reviewed and in the victim's testimony at defendant's sentencing hearing.

Because declining to strike a prior strike conviction is the "norm," we presume the trial court's decision was proper. (*Carmony*, *supra*, 33 Cal.4th at p. 378.) The fact that defendant's prior strike convictions were 30 and 35 years old does not convince us otherwise. "In determining whether a prior conviction is remote, the trial court should not simply consult the Gregorian calendar with blinders on." (*People v. Humphrey* (1997) 58 Cal.App.4th 809, 813 (*Humphrey II*); see *People v. Solis* (2015) 232 Cal.App.4th 1108, 1124 [a prior strike conviction is not properly stricken merely because it is 30 years old].) "To be sure, a prior conviction may be stricken if it is remote in time. In criminal law parlance, this is sometimes referred to as 'washing out.' [Citations.] The phrase is apt because it carries the connotation of a crime-free cleansing period of rehabilitation after a defendant has had the opportunity to reflect upon the error of his or her ways." (*Humphrey II*, at p. 813.)

However, in this case, defendant did not live a " 'legally blameless life' " after his 1983 and 1988 rape convictions. (*Humphrey II*, *supra*, 58 Cal.App.4th at p. 813.) He was under the close supervision of prison authorities while incarcerated until 2004, then under parole supervision until 2007. Only after 2007 was defendant responsible for himself. While defendant suffered no further convictions between 2007 and 2013, his drinking and drug issues led to his public intoxication conviction in 2014 and the instant offense in 2015. Considering these circumstances, defendant's prior strike convictions were not so remote that he necessarily fell outside the spirit of the Three Strikes law. On the contrary, defendant's criminal history supports sentencing under the Three Strikes law. The convictions and instant offense reveal serious and persistent criminal behavior. (See *People v. Gaston* (1999) 74 Cal.App.4th 310, 320.) No case law compels a judge to strike a prior conviction simply based on its age.

Similarly, the nature of the instant offense does not convince us that the trial court abused its discretion in refusing to strike the prior strike conviction. Defendant's instant offense also involved violence against women. While defendant attempted to minimize

46.

the severity of the instant offense because it is not a " 'serious or violent' felony," defendant punched the victim in the face, blackened her eye and cheek and threw her head against a wall. In *Williams*, the Supreme Court characterized misdemeanor spousal battery as a " 'crime[ ] involving actual violence.' " (*Williams*, *supra*, 17 Cal.4th at p. 164.) We do not believe that the trial court abused its discretion in noting the similarity of defendant's past convictions and the instant offense involving violence inflicted on women, even if not of a sexual nature as to the instant offense. The similarity between the prior conviction and the instant offense " 'reveals that [defendant] had been taught, through the application of formal sanction, that [such] criminal conduct was unacceptable—but had failed or refused to learn his lesson' [citation]." (*Id.* at p. 163, first & third bracketed insertions added.) The nature of the instant offense did not require the trial court to find defendant was outside the spirit of the Three Strikes law.

Furthermore, defendant's alleged addiction to drugs did not operate to excuse his commission of crimes. (See *People v. Martinez* (1999) 71 Cal.App.4th 1502, 1511 ["drug addiction is not necessarily regarded as a mitigating factor when a criminal defendant has a long-term problem and seems unwilling to pursue treatment"].)

Defendant has failed to show that the trial court was either unaware of its discretion or considered impermissible factors. We cannot say that its ruling was irrational or arbitrary such that no reasonable person could agree with it. The record shows that the trial court considered counsels' arguments as well as defendant's criminal history and his conduct in the instant offense in declining to strike his prior convictions. On the record before us, the trial court did not abuse its discretion in deciding that the prior strike convictions and instant offense fell within the spirit of the Three Strikes law.

*IV.* ***The trial court did not violate due process when imposing fines, fees, and assessments without determining whether defendant has the ability to pay.***

### A. Background

As part of defendant's sentence, the trial court ordered that defendant pay an $890 fine[14] (§ 273.5, subd. (a));[15] a $40 fine[16] (§ 1202.5);[17] a $750 presentence report fee (former § 1203.1b); and a $108.19 booking fee (former Gov. Code, § 29550.2). However, the trial court failed to impose a $40 court operations assessment (§ 1465.8, subd. (a)) and a $30 criminal conviction assessment (Gov. Code, § 70373) as to count 2. The trial court also failed to order restitution (§ 1202.4, subd. (b)) and direct victim restitution (§ 1202.4, subd. (f)) fines as to both counts.

### B. Analysis

Defendant argues the court violated his due process rights by imposing these fines, fees, and assessments without determining whether he has the ability to pay them. Defendant's due process argument is based on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which was decided after defendant was sentenced and while his current

---

[14] The fine included a (1) $200 base fine (§ 273.5, subd. (a)); (2) $340 state and local penalty assessment (Pen. Code, § 1464 & Gov. Code, § 76000); (3) $40 criminal surcharge (§ 1465.7); (4) $100 state court construction penalty (Gov. Code, § 70372, subd. (a)); (5) $40 court operations assessment (§ 1465.8, subd. (a)); (6) $100 DNA penalty assessment (Gov. Code, § 76104.6); (7) $40 emergency medical services penalty assessment (Gov. Code, § 76000.5); and (8) $30 criminal conviction assessment (Gov. Code, § 70373).

[15] We note that the trial court failed to indicate that this fine was applicable to count 1 but find that the reference to section 273.5, subdivision (a) clearly indicates that the fine was ordered as part of the sentence for count 1.

[16] The fine included a (1) $10 base fine (§ 1205.5); (2) $ 17 state and local penalty assessment (Pen. Code, § 1464 & Gov. Code, § 76000); (3) $2 criminal surcharge (§ 1465.7); (4) $5 state court construction penalty (Gov. Code, § 70372, subd. (a)); (5) $4 DNA penalty assessment (Gov. Code, § 76104.6); and (6) $2 emergency medical services penalty assessment (Gov. Code, § 76000.5).

[17] We note that the trial court failed to specifically indicate that this fine was applicable to count 2. However, section 1205.5 provides for a $10 fine for violations of section 594—the crime charged in count 2—indicating that the trial court sentenced defendant to pay this fine as the sentence for count 2.

48.

appeal was pending. *Dueñas* held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes" certain fines or fees. (*Id.* at p. 1164; accord, *People v. Castellano* (2019) 33 Cal.App.5th 485, 488–489.) Relying on *Dueñas*, defendant asks this court to remand and order that no fines or fees be imposed unless the trial court finds that defendant has a present ability to pay.

The People ask that the case be remanded because the trial court failed to impose a restitution fine or victim restitution. The People argue that upon remand, defendant should be permitted to request that the trial court consider his ability to pay the various fines, fees, and assessments—with the proviso that any challenge to punitive fines must be evaluated under Eighth Amendment standards, rather than due process principles.

We find defendant's assertions unpersuasive and decline to stay or vacate the imposed fines, fees, and assessments or to remand on this basis. We will address the People's request regarding the mandatory restitution fine and victim restitution separately below.

In *Dueñas*, the defendant lost her driver's license because she was financially unable to pay her juvenile citations. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1161.) She continued to reoffend for driving with a suspended license because the aggregating criminal conviction assessments and fines prevented her from recovering her license. (*Ibid.*) The *Dueñas* court described this as "cascading consequences" stemming from "a series of criminal proceedings driven by, and contributing to, [the defendant's] poverty." (*Id.* at pp. 1163–1164.) The *Dueñas* court concluded the defendant faced ongoing unintended punitive consequences because of the imposed financial obligations. (*Id.* at p. 1168.) *Dueñas* determined those unintended consequences were "fundamentally unfair" for an indigent defendant under principles of due process. (*Ibid.*)

We decline to expand *Dueñas*'s holding beyond the unique facts found in that case. Unlike the *Dueñas* defendant, here, defendant does not establish the violation of a

49.

fundamental liberty interest. (See *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1056.) His incarceration was not a consequence of prior criminal assessments and fines. He was not deprived of liberty because of his indigency. (*See id.* at pp. 1056–1057 [due process not violated when defendants are not denied access to the courts, not prohibited from presenting a defense, not incarcerated due to an inability to pay prior fees, fines, or assessments, do not face ongoing unintended punitive consequences, or do not suffer a violation of a fundamental liberty interest]; *People v. Son* (2020) 49 Cal.App.5th 565, 599–601 (conc. & dis. opn. of Franson, J.) [no violation of fundamental liberty interest where trial court imposed disputed fees, fines, and assessments without first conducting an ability to pay hearing; case did not present unique concerns addressed in *Dueñas*—the defendant was not incarcerated because of his indigency, but for his continuing violent criminal acts while serving a life prison term]; but see *id.* at pp. 577–579 (lead opn. of Smith, J.) [nonpunitive court facilities and court operations assessments may not be imposed on a defendant who is unable to pay because these charges are imposed on court users for use of the court, burdening their exercise of the fundamental right of access to the criminal courts].)

In any event, we find any error arising from the court's failure to make an ability to pay finding was harmless beyond a reasonable doubt since defendant has the ability to pay the fine and fees imposed in this case. (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1030–1031, 1035; *Aviles*, *supra*, 39 Cal.App.5th at pp. 1075–1077.)

" ' "Ability to pay does not necessarily require existing employment or cash on hand." [Citation.] "[I]n determining whether a defendant has the ability to pay a restitution fine, the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in the future." [Citation.] This include[s] the defendant's ability to obtain prison wages and to earn money after his release from custody.' " (*Aviles*, *supra*, 39 Cal.App.5th at p. 1076.)

We can infer from the instant record that defendant has the ability to pay the aggregate amount of fines, fees, and assessments from probable future wages, including prison wages. (*Aviles*, *supra*, 39 Cal.App.5th at p. 1076; *People v. Lowery*, *supra*, 43 Cal.App.5th at pp. 1060–1061; accord, *People v. Douglas* (1995) 39 Cal.App.4th 1385, 1397.) The court sentenced defendant to 25 years to life and there is nothing in the record that shows defendant would be unable to satisfy the fines, fees, and assessments imposed by the court while serving his prison term. While it may take defendant some time to pay the amounts imposed in this case, that circumstance does not support his inability to make payments on these amounts from prison wages during his prison sentence. (See, e.g., *People v. Jones*, *supra*, 36 Cal.App.5th at p. 1035 ["Given that the restitution fine is $300 and the assessments are $70, [the defendant] will have sufficient time to earn these amounts during his sentence, even assuming [he] earns nothing more than the minimum"]; see also *People v. Lewis* (2009) 46 Cal.4th 1255, 1321 [concluding large restitution fine which would be deducted from portion of any funds given to the defendant by his family was not inappropriate]; *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505 [court did not abuse its discretion in imposing maximum fine although it may be difficult for the defendant to pay it].)

We thus conclude, based on the record before us, that defendant is able to pay the fines, fees, and assessments he was ordered to pay. He is not entitled to remand for a hearing on the subject.

## V.     *Other Alleged Trial Court Errors Regarding Sentence*

The People additionally contend that the trial court erred by failing to (1) sentence defendant on count 2, (2) impose a $40 court operations assessment (§ 1465.8, subd. (a)) and a $30 criminal conviction assessment (Gov. Code, § 70373) on count 2, and (3) order both a restitution fine (§ 1202.4, subd. (b)) and direct victim restitution (§ 1202.4, subd. (f)) on both counts.

51.

## A.    Legal Standard

"In passing sentence, the court has a duty to determine and impose the punishment prescribed by law." (*People v. Cattaneo* (1990) 217 Cal.App.3d 1577, 1589.) Although the People did not appeal the sentence or object below, an unauthorized sentence may be challenged "for the first time on appeal, and is subject to judicial correction whenever the error comes to the attention of the reviewing court." (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6.) Based on our review of the record, it appears the trial court erred in failing to impose mandatory assessments and direct victim restitution. However, the People forfeited their objection to the trial court's failure to order a restitution fine.

## B.    *The trial court sentenced defendant on count 2.*

The court had a duty to pronounce judgment on each count of which defendant was convicted. (*Hoffman v. Superior Court* (1981) 122 Cal.App.3d 715, 724). The People request remand, arguing that the trial court did not impose a sentence on count 2. However, we do not agree that a sentence was not pronounced on count 2. The trial court pronounced defendant's sentence as follows:

> "In this case, probation is hereby denied pursuant to [section ]667, subdivision (c)(2) of the Penal Code.

> "Count 1, violation of Section 273.5, subdivision (a) of the Penal Code, [ ] defendant is sentenced to 25 years to life pursuant to [section ]1170.12, subdivision (c)(2)(a) of the Penal Code.

> "Parole term to fasten.

> "[Section ]296 of the Penal Code has been verified.

> "Driver's license suspended for two years pursuant to [former Vehicle Code section ]13202.6, subdivision (a)(1) …. Postponement of suspension to commence following release from prison.

> "Defendant's to pay a fine in the amount of $890 pursuant to [section ]273.5, subdivision (a) of the Penal Code, which consists of the components listed in the probation officer's report and to be included in the minute order.

"Defendant's to pay a $40 fine pursuant to section 1202.5 of the Penal Code, which consists of the components listed in the probation officer's report and to be included in the minute order.

"Defendant is to pay a $750 felony presentence report fee pursuant to [former section ]1203.1(b) of the Penal Code.

"And $108.19 booking fee payable to the City of Madera pursuant to [former] California Government Code Section 29550.2."

While the trial court did not refer specifically to count 2 (vandalism in violation of § 594, subd. (a)) in pronouncing judgement, it did order a fine pursuant to section 1202.5 and suspended defendant's driver's license pursuant to former Vehicle Code section 13202.6, subdivision (a)(1). Inasmuch as both of those sections describe penalties for section 594 and not section 273.5 (count 1), the trial court did impose sentence on count 2, ordering the payment of a fine and the suspension of defendant's driver's license. Vandalism, as charged in the amended information, can be punished by up to one year in custody or by a fine alone. (§ 594, subd. (b)(2)(A).) We reject the People's argument that the trial court failed to pronounce defendant's sentence as to count 2.

C.      *The trial court failed to impose mandatory assessments.*

The People are correct that the trial court failed to impose a $40 court operations assessment (§ 1465.8, subd. (a)) and a $30 criminal conviction assessment (Gov. Code, § 70373) as to count 2. The presentence report noted that the assessments would apply to both counts but failed to include them in the $40 total fine for count 2. The trial court, relying on the presentence report, similarly failed to include them in the total fine for count 2. Defendant responds that because the trial court did impose a fine on count 2, failure to include the assessments indicates the trial court intended to waive them. However, the court operations and criminal conviction assessments are mandatory, and we may order them on appeal. (*People v. Rodriguez* (2012) 207 Cal.App.4th 1540, 1543, fn. 2; *People v. Woods* (2010) 191 Cal.App.4th 269, 272–273.)

**D.** *The people have forfeited objection to the trial court's failure to impose a restitution fine.*

The People request that we remand the matter so the court may determine and orally impose the restitution and parole revocation fines pursuant to sections 1202.4 and 1202.45, or state compelling reasons for not imposing the fines. However, we agree with defendant that the People's failure to object earlier prevents correction by this court.

Section 1202.4, subdivision (b) provides: "In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record." The amount of any restitution fine imposed lies within the court's discretion, but for felony convictions "shall not be less than three hundred dollars ($300) and not more than ten thousand dollars ($10,000)." (*Id.*, subd. (b)(1).) Section 1202.45 further requires the court to, "at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4," if the defendant's sentence includes a period of parole. (§ 1202.45, subd. (a).) In other words, both fines must be imposed in a minimum amount of $300 "unless the sentencing court, in the words of the statute, 'finds compelling and extraordinary reasons for not doing so, and states those reasons on the record.' " (*People v. Tillman* (2000) 22 Cal.4th 300, 302.)

In *Tillman*, as here, the trial court failed to impose the restitution fines and did not state its reasons for not imposing them on the record. (*People v. Tillman*, *supra*, 22 Cal.4th at p. 302.) The prosecution asked the Court of Appeal to amend the judgment to add the fines. (*Ibid.*) The Court of Appeal did so, and the Supreme Court reversed, concluding that "the waiver doctrine bars the People from obtaining the relief they seek on appeal." (*Ibid.*) Because the trial court may refuse to impose the restitution fine for " 'compelling and extraordinary reasons,' " opposition to a discretionary sentencing decision must be made in the trial court before challenging the decision on appeal. (*Ibid.*,

citing *People v. Scott* (1994) 9 Cal.4th 331 & *People v. Welch* (1993) 5 Cal.4th 228.) Therefore, an appellate court may not correct errors arising from the trial court's failure to make or articulate its discretionary sentencing choices if the complaining party— whether the defendant or the People—failed to object to the omission at trial.

The trial court erred in failing to comply with sections 1202.4, subdivision (b) and 1202.45, subdivision (a). It was required to either impose the fines or state its reason for declining to do so but did not. This error is not correctable on appeal because it was not timely brought to the trial court's attention. We will not remand to the trial court for further proceedings with regard to these fines.

### E.    The trial court erred in failing to order victim restitution.

The probation officer's presentence report was read and considered by the trial court prior to sentencing and stated that restitution was an issue. Nevertheless, there was no discussion of victim restitution at sentencing, no order of direct victim restitution was made, and the prosecutor did not object. The People argue that we are required to remand to the trial court for a restitution hearing. Defendant has not addressed the People's argument regarding victim restitution except to acknowledge the trial court retains jurisdiction to address victim restitution. While we will order the abstract of judgment to be amended to reflect defendant's mandatory obligation to pay victim restitution, we see no need for remand for the reasons discussed below.

Unlike the restitution fine, a trial court's failure to order victim restitution is not subject to waiver because the People failed to object. (See *People v. Moreno* (2003) 108 Cal.App.4th 1, 10.) Direct victim restitution is not a discretionary sentencing choice as it is mandated by the California Constitution (art. I, § 28, subd. (b), par. (13)). This mandate is carried out through section 1202.4. (*People v. Giordano* (2007) 42 Cal.4th 644, 656.) Section 1202.4, subdivision (f) requires the trial court to order restitution to victims whenever a victim has suffered economic loss as a result of the defendant's

55.

conduct. If the amount of loss cannot be ascertained at the time of sentencing, the restitution order shall include a provision that the amount shall be determined at the direction of the court. (*Ibid.*) A trial court is mandated to order "full restitution." (*Ibid.*; see *People v. Rowland* (1997) 51 Cal.App.4th 1745, 1751–1752; see also *People v. Bernal* (2002) 101 Cal.App.4th 155, 164–165.)

Because victim restitution is mandatory, "a sentence without such an award is invalid." (*People v. Rowland, supra*, 51 Cal.App.4th at p. 1751; see also *People v. Bernal, supra*, 101 Cal.App.4th at pp. 164–165 [sentence that fails to award victim restitution, or to award full restitution, is invalid], citing *Rowland*, at p. 1751; *People v. Moreno, supra*, 108 Cal.App.4th 1 at pp. 10–11 [failure to order any victim restitution rendered the sentence invalid, and correctable at any time under section 1202.46].) A reviewing court can order correction of an unauthorized sentence, even when the prosecution has not appealed. (*People v. Valdez* (1994) 24 Cal.App.4th 1194, 1198–1204 [sentence making no provision for victim restitution is unauthorized, and subject to correction notwithstanding prosecution's failure to object at sentencing].)

The judgment shall be modified to order defendant to pay direct victim restitution as to counts 1 and 2 in an amount to be determined by the probation department. (§ 1202.4, subd. (f).) Defendant shall pay restitution to the victim identified in the presentence report or, if the victim has received assistance from the California Victim Compensation Board, restitution shall be deposited into the Restitution Fund. (*Id.*, subd. (f)(2).)

The People request that we remand to the trial court for a victim restitution hearing in this matter. However, section 1202.46 provides continuing jurisdiction for a trial court to impose or modify restitution and permits a victim, the district attorney, or the trial court on its own motion to address victim restitution at any time. The victim in this case failed to provide the probation department with specific information as to economic losses suffered due to defendant's conduct. Though she testified at the sentencing

hearing, Phyllis still did not provide information regarding her economic losses. However, should the People or Phyllis desire to seek restitution from defendant, section 1202.46 provides the appropriate procedure for doing so in the trial court at any time and, therefore, remand is unnecessary.

### F. Effect of Assembly Bill No. 1869

The $750 presentence report fee (former § 1203.1b) and $108.19 booking fee (former Gov. Code, § 29550.2) recently became "unenforceable and uncollectible" through the enactment of Assembly Bill No. 1869 (2019–2020 Reg. Sess.), effective July 1, 2021. The bill added section 1465.9, subdivision (a), which states in relevant part:

> "On and after July 1, 2021, the balance of any court-imposed costs pursuant to … Sections … 1203.1b … as those sections read on June 30, 2021, shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Stats. 2020, ch. 92, § 62.)

The bill also added the Government Code section 6111, subdivision (a), which states in relevant part:

> "On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to … Sections … 29550.2 … as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Stats. 2020, ch. 92, § 11.)

Now that July 1, 2021, has passed, we think the plain language of this statute requires that we vacate any portion of the judgment imposing any unpaid balance of the $750 presentence report fee (former § 1203.1b) and the $108.19 booking fee (former Gov. Code, § 29550.2). (See *People v. Clark* (2021) 67 Cal.App.5th 248, 259.) The parties agree.

### DISPOSITION

The judgment is modified to impose a $40 court operations assessment (§ 1465.8, subd. (a)) and a $30 criminal conviction assessment (Gov. Code, § 70373) as to count 2.

The judgment is further modified as to counts 1 and 2 to order defendant to pay direct victim restitution in an amount to be determined by the probation department to the victim identified in the presentence report.  (See § 1202.4, subd. (f).)  If the victim has received assistance from the California Victim Compensation Board, restitution shall be deposited into the Restitution Fund.  (*Id*., subd. (f)(2).)

Any portion of the judgment imposing any balance of the $750 presentence report fee imposed pursuant to former section 1203.1b and the $108.19 booking fee imposed pursuant to former Government Code section 29550.2 unpaid as of July 1, 2021, is vacated.

The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment reflecting the modifications.

As modified, the judgment is affirmed.


                                             HILL, P. J.

WE CONCUR:


DETJEN, J.


PEÑA, J.

58.